IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TELMA HALL,                          )
                                     )
         Plaintiff,                  )
                                     )
v.                                   )        CASE NO.: 2:16-cv-593-GMB
                                     )
ALABAMA STATE UNIVERSITY,            )        [WO]
                                     )
         Defendant.                  )

## MEMORANDUM OPINION AND ORDER

Pending before the court is a Motion for Summary Judgment filed by Defendant

Alabama State University ("ASU"). Doc. 20.  Plaintiff Telma Hall, ASU's former head

softball coach, filed this lawsuit on July 19, 2016, alleging discrimination on the basis of

her gender and retaliation for complaining about different treatment on the basis of gender

in violation of 42 U.S.C. § 200e, *et seq*. ("Title VII"). Doc. 1.[1]  Specifically, in her

complaint Hall brings a claim of discrimination on the basis of gender (Count I) for the

following actions: paying her less than similarly situated male employees, denying her

contracts with the same terms and benefits, providing her sport with less financial support,

suspending her, terminating her employment, failing to follow university policies, and

subjecting her to stricter scrutiny.  She also states a claim of retaliation (Count II) based on

actions taken against her during her employment.  The parties have consented to

---

[1] Although ASU's motion refers to an Equal Pay Act claim, Hall clarifies in her opposition brief that she brings two types of claims in her complaint:  discrimination on the basis of gender and retaliation in violation of Title VII. Doc. 35 at 1.

jurisdiction in this court pursuant to 28 U.S.C. § 636(c). After careful consideration of the parties' submissions, the applicable law, and the record as a whole, it is ORDERED that the Motion for Summary Judgment (Doc. 20) is due to be GRANTED in part and DENIED in part.

## I.  JURISDICTION AND VENUE

The court has subject-matter jurisdiction over the claims in this action pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations to support both.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

### III. FACTS

The facts, taken in a light most favorable to the nonmovant, are as follows:

Hall was a female employee of Defendant ASU who served as the softball head coach from October 17, 2005 until May 2, 2014. Hall also served as an adjunct professor, teaching physical education and wellness classes. During her tenure, Hall served first under Athletic Director Stacy Danley and then Athletic Director Melvin Hines.

As an adjunct professor, Hall was a part-time, at-will employee. The length of a contract for an adjunct professor is one semester. As a coach, Hall was classified as a Special Athletic Appointee. Head coaches at ASU are responsible for their programs, including recruiting, ensuring athletes have a rewarding experience, requesting budgets, and reporting violations of National Collegiate Athletic Association ("NCAA") rules. Doc. 20-6 at 42 & 102:19–103:12.

Salaries and fringe benefits of coaches at ASU are set when the coaches are hired. Each head coach is given a salary pool that he or she divides among the number of paid assistant coaches the NCAA allows for that sport. Doc. 20-6 at 105:6–16.[2] ASU's President and Board of Trustees have to approve the assistant coach salaries, however. Each sports team's travel and recruitment budget is established with a specific amount set out in the total budget for that sport. Doc. 20-6 at 57:23–58:20.

Hall was hired at a salary of $34,000 per year with no performance-based bonuses and no car allowance. Doc. 26-5 at 119. In June 2011, Hall made a request that the salary

---

[2] The court will refer to the CM/ECF document number and page numbers in citing to evidence, generally, but will use the CM/ECF document number and internal page numbers for deposition testimony.

of the softball assistant coach be increased. In July of that year, she emailed Danley, who was then the Athletic Director, about increasing the budget and salaries for the softball program. Hall had been receiving an annual salary of $38,079 since October 1, 2007. Doc. 26-5 at 122.

Mervyl Melendez was a male employee of ASU who was hired as the head baseball coach in 2011 at an annual base salary of $125,000, with a car allowance, a signing bonus, and additional bonuses and performance bonus opportunities. Doc. 26-5 at 124. Jose Vazquez and Drew Clark were hired as the Associate Coach and Assistant Coach for baseball, respectively. Vazquez received a salary of $80,000 per year and Clark was paid $40,000 per year. Doc. 26-5 at 115.

In November 2011, Hall filed a complaint with Danley about gender equity and salary concerns in the softball program. In January 2012, Hall filed an internal Title IX complaint, which was denied on April 12, 2012, and she was told that there was no avenue for appealing this decision. Doc. 26-8 at 173.

Hines became Acting Athletic Director in September 2012. He was hired into the position of Athletic Director in 2014. Doc. 26-5 at 38:14–16.

In February 2013, Hall filed an Equal Employment Opportunity Commission ("EEOC") charge alleging gender discrimination in pay and terms of employment. Doc. 26-8. In her EEOC charge, Hall complained that the baseball head coach had a salary of $125,000 in 2012 compared to her salary of $38,079 and that she had no potential for performance bonuses.

Also in February 2013, Hall signed her first contract that did include performance-

based bonuses for her and her assistant coaches, along with a car allowance. Doc. 26-5 at 102. One bonus was based on the Academic Progress Rate ("APR") of her team members, which is measurement of the students' academic success. Melendez's contract also included bonus opportunities but included bonuses and bonus opportunities that Hall's contract did not contain.

A July 24, 2013 Office of Civil Rights ("OCR") Resolution Agreement entered into by ASU required it to "improve its hiring practices to attract more qualified coaches to the women's programs, by seeking coaches with more coaching experience by increasing compensation packages and other conditions of employment so that the positions offered are equivalent to those provided to coaches hired for the men's teams," but did not require that Hall's salary be increased. Doc. 26-8 at 191–93.

In August 2013, Hines conducted a performance appraisal of Hall. Hall received a score of "Requires Improvement" in the areas of quantity and quality of work and policies and procedures. At the time, Hall's overall record of wins as softball coach was below 40 percent and the APR rate for the softball team was below the NCAA's requirement. Doc. 20-2 at 119:7–120:17.

In February 2014, Gwendolyn Boyd ("Boyd") was hired as President of ASU. Doc. 26-3 at 106:10–13.

On March 2, 2014, the parents of a softball player sent an email to officials in the Athletic Department at ASU and to Boyd complaining about Hall. Doc. 20-2 at 127:3–128:8. Another set of parents followed with an email complaint on March 3, 2014. The parents' complaints included allegations that Hall did not provide sufficient food to the

athletes during team travel, that athletes were left on a bus, and that practice hours prevented students from eating in the cafeteria. Doc. 20-2 at 129:2–23 & 138:10–14.

The next day, March 4, 2014, Zillah Fluker, Interim Vice President in ASU's Office of Human Resources, sent a letter to Hall placing her on administrative leave with pay. Doc. 26-1 at 80. As a result of her administrative leave, Hall was not allowed to have any contact with students on campus to teach or to continue to take her own graduate-level classes. Doc. 26-1 at 80. Hines referred the investigation of the complaints against Hall to attorney Michael Buckner. Doc. 26-2 at 31:16–32:4.

Hall testified in her deposition that while she was at ASU, the tennis coach and a baseball coach, Larry Watkins, were allowed to teach classes after they had been removed as coaches. Doc. 26-1 at 258:8–12. Willie Dixon, the Director of Human Resources at ASU, testified in her deposition that ASU's Provost would have to decide whether a coach who is also a teacher would be entitled to remain on duty as a teacher if removed as a coach. Doc. 26-7 at 148:3–13.

Hall presents evidence that Melendez was not banned from campus or from contact with students even though a parent complained that he was requiring athletes to use performance-enhancing drugs and he was investigated for possible NCAA violations. Doc. 26-24 at 7. Hall argues in her brief that Reggie Barlow and Craig Payne, who were football coaches, were investigated after they left ASU for violations of NCAA rules. Doc. 35 at 32. Hall also contends that Brian Jenkins was hired by ASU as a football coach even though there had been allegations against him for NCAA violations. Doc. 35 at 32–3.

On April 28, 2014, Hines recommended to John Knight, ASU's Executive Vice

President and Chief Operating Officer, that Hall be terminated from her employment. Doc. 20-9. Hall's notice of termination issued on May 2, 2014. At the time the recommendation for termination was made, the NCAA investigation had not concluded.

On August 7, 2014, Hall amended her EEOC charge to include a claim of retaliation.

On October 21, 2016, the NCAA issued ASU a Public Infractions Decision and found that the softball program had exceeded NCAA limits on practice time. Doc. 26-1.

## IV. DISCUSSION

### A. Title VII Gender Discrimination Claims

Title VII prohibits an employer from discriminating against an employee on the basis of her gender. *See* 42 U.S.C. § 2000e-2(a)(1). Where, as here, a plaintiff asserts circumstantial evidence of discrimination, the court applies the framework first established by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Hall must first establish a *prima facie* case of employment discrimination, creating a presumption that the employer discriminated against her by showing that (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside of her class more favorably. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. *Id.* If the employer meets this burden, the plaintiff must then demonstrate that the employer's proffered reason is merely a pretext for discrimination. *Id.*

Hall has identified several different employment actions as being the bases for her gender discrimination claim, including the denial of contracts with the same terms and benefits as male employees, a difference in financial support for female sports teams, a difference in pay, a difference in treatment by suspending her from coaching and teaching duties, the termination of her employment, subjecting her to stricter scrutiny, and failing to follow university policies.

In examining these employment actions, it appears to the court that Hall's theories of stricter scrutiny and ASU's violation of university policy both relate to her suspension. Therefore, rather than treat each of these as a separate claim, the court will address those aspects of her claim together, and begins its analysis with that theory.

### 1. Difference in Treatment in Suspension

Hall brings a claim for disparate treatment based on her suspension from her employment after the parents of two softball players made allegations against her. Hall's claim is that she was barred from campus, she was not given notice when she was removed from her adjunct teaching responsibilities, ASU did not follow its policies in suspending her, and male coaches were not treated in this way after similar accusations.

A plaintiff can establish a *prima facie* case of discrimination in discipline by showing that (1) she is a member of a protected class; (2) she was qualified for the position or benefit sought; (3) she was subjected to an adverse employment action; and (4) she suffered from a differential application of work or disciplinary rules. *Spivey v. Beverly Enters., Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999). As to element four, a plaintiff "must show either (a) that [s]he did not violate the work rule, or (b) that [s]he engaged in

misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against h[er] were more severe than those enforced against the other persons who engaged in similar misconduct." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989). The relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies. *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999). "When an individual proves that he was fired but one outside his class was retained although both violated the same work rule, this raises an inference that the rule was discriminatorily applied . . . ." *Id.*

The court will separately address the claims relating to Hall's suspension from coaching and suspension from teaching.

### a. Suspension from Coaching

Hall contends that when ASU suspended her without pay and required her to stay away from campus, it treated her differently than it had treated male coaches with allegations against them. When a parent made a complaint against baseball head coach Melendez, Hall argues that he was not suspended, was provided notice of the allegations against him, and participated in the investigation. Hall also points to Andrew Chatman, the head coach for male bowling, and acknowledges that he was suspended for three days without pay but maintains that he was not suspended after allegations of sexual relationships with student athletes. Hall states that football coaches Reggie Barlow and Craig Payne had NCAA violations reported, including violations concerning athlete welfare, and were not suspended during the investigation of the allegations, and that

football coach Brian Jenkins was hired even though he had NCAA violations concerning student welfare pending against him.

ASU's position is that these coaches did not engage in similar behavior to Hall and that it had to separate Hall from ASU students immediately because she was accused of putting a student in danger. Specifically with respect to the comparators identified by Hall, ASU has introduced evidence that Chatman, the bowling coach, was suspended for three days and the investigation of the complaint against him was handled by Human Resources, not the Athletics Department. Doc. 20-6 at 242. ASU also has developed evidence that Reggie Barlow and Craig Payne are not proper comparators because a 2015 NCAA investigation of them occurred after their employment with ASU had ended. Doc. 20-6 at 314:20–315:12. As to Jenkins, ASU says that a newspaper reported NCAA violations at Jenkins' prior employer, but that ASU had contacted the NCAA and there were no pending investigations against Jenkins when he was hired at ASU. Doc. 20-6 at 323:20–23.

The court agrees that the evidence presented regarding Chatmon, Barlow, Payne, and Jenkins does not create a question of fact as to whether there is a sufficient degree of similarity to Hall's situation to establish a *prima facie* case. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (holding a "comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer."). The evidentiary material regarding the investigation of Melendez, on the other hand, shows him to be an appropriate comparator for purposes of the *McDonnell Douglas* analysis. A baseball parent alleged "numerous violations of NCAA regulations and federal and state law by Melendez and the baseball program (including, but not limited

to, the use of performance enhancing drugs by baseball student-athletes and discrimination against non-Hispanic baseball student athletes).” Doc. 26-24 at 28.

ASU argues that Hall's and Melendez' situations are distinct because Melendez' investigation did not involve a student welfare issue. In her deposition, however, Boyd, who was the President who approved Hall's suspension, was specifically asked to compare Hall's situation to the hypothetical situation of a baseball coach accused of asking students to take performance enhancing-drugs and whether that accusation would be enough to suspend the coach pending an investigation. Doc. 20-8 at 120:18–23. Boyd answered, “[p]ending an investigation, absolutely, because that's an NCAA violation.” Doc. 20-8 at 120:24–25. When asked about such a complaint being made by a baseball player's father, Boyd answered that the “same action would have been taken as we did with Ms. Hall, immediately remove them from the students by placing them on administrative leave, investigate to find out if it's true, and then take the appropriate action.” Doc. 20-8 at 120:24–25 & 121:8–12. Boyd's testimony, therefore, supports a conclusion that the same ASU policy applied to, and was violated by, Melendez and Hall. Drawing all reasonable inferences in favor of the nonmovant, a reasonable jury could conclude that Boyd's testimony equates the two employees and makes them sufficient comparators.

ASU notes that, at the commencement of the Melendez investigation, Dr. William Harris was the President of ASU and Stacy Danley was the Athletic Director. ASU argues that this is significant because, under Eleventh Circuit law, “differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination” because “different supervisors may employ different disciplinary

measures." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 n. 5 (11th Cir. 2001). The Eleventh Circuit also has clarified, however, that the presence of two different supervisors is not determinative. *See Anderson v. WBMG-42*, 253 F.3d 561, 566 (11th Cir. 2001) (stating that cited authorities do not stand for the proposition that whenever two different supervisors are involved in administering the disciplinary actions, the comparators cannot as a matter of law be similarly situated for Title VII purposes). Although Harris was the President at the commencement of the investigation of Melendez, the evidence before the court is that a report was submitted to the NCAA on Melendez in September 2013, and that an additional report was made in February 2015. Doc. 26-24. Boyd became president in February 2014, which was before the end of Melendez's investigation. The President approved the actions of the Athletic Directors. The court cannot conclude, therefore, as a matter of law that the difference in presidents is dispositive. *Cf. Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281 (11th Cir. 2008) (stating that "even as Appellees contend that Rubin was not directly involved in the investigation of Dunham, they concede it was necessary for him to approve the ultimate sanction imposed").

The court is mindful that comparators accused of violations of a rule must be nearly identical. *Wilson*, 376 F.3d at 1091. But as described above, Boyd, the President of ASU who approved Hall's suspension and became President before the end of the Melendez investigation, testified in her deposition, when given a hypothetical scenario consistent with the evidence concerning a complaint against Melendez, that the offender in the hypothetical should have been suspended just like Hall. The court concludes, therefore,

that Hall has established a *prima facie* case of disparate treatment in suspension from coaching.

ASU's articulated reason for placing Hall on suspension is that the allegations against her involved athlete safety. Again, in light of Boyd's deposition testimony regarding allegations against a coach for requiring steroid use of athletes, drawing all reasonable inferences in favor of the nonmovant, the court concludes that a reasonable jury could conclude that ASU policy was not followed in Hall's situation. An "employer's deviation from its own standard procedures may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006). The court concludes, therefore, that the evidence is sufficient to call into question the articulated reason for Hall's suspension from coaching and that summary judgment is due to be DENIED as to this aspect of Hall's claim.

### b. Suspension from Teaching

The second aspect of Hall's suspension claim is that she was suspended not just from her coaching position, but also from her adjunct teaching duties and her own graduate classes. Hall testified in her deposition that a tennis coach and the baseball coach were removed as coaches but were allowed to continue to teach classes. Doc. 26-1 at 67:8–15. Hall also states that ASU did not follow its policies by not allowing her to file a grievance relating to her removal as an adjunct teacher. Hall argues that ASU's policies required that she be given notice of the allegations against her.

ASU's position is that Hall has not shown that the unnamed tennis coach and former head coach of baseball, Larry Watkins, were allowed to teach after being removed based

on allegations of conduct similar to that for which she was suspended. ASU provides evidence that it moved Watkins to the position of Special Assistant to the Athletic Director when it replaced him as head coach of baseball with Melendez. Doc. 20-6 at 356:4–6. There is no evidence that Watkins was removed in response to allegations of misconduct. ASU also points to deposition testimony from Willie Dixon, the Director of Human Resources at ASU, indicating that whether a coach who is also a teacher would be entitled to remain on duty as a teacher if removed as a coach would be a decision made by the Provost. Doc. 26-7 at 148:3–13.

Whether or not ASU followed appropriate procedures in suspending Hall from teaching, there is no evidence before the court that a male coach from any sport was suspended or removed from his coaching job based on complaints against him but allowed to continue teaching classes. The court cannot conclude, therefore, that Hall has pointed to sufficient evidence to establish a *prima facie* case of discrimination in suspension from teaching or taking classes. Summary judgment is due to be GRANTED as to this aspect of Hall's claim.

### 2. *Termination*

Hall has claimed that she was treated differently from other male coaches with allegations against them because she was terminated and those coaches were not. ASU disputes that any of the coaches she has points to were similarly situated to Hall, and also has provided evidence that Hines made the recommendation to terminate Hall to John Knight, former Executive Vice President and COO, for three reasons: (1) Hall had committed NCAA rule violations, (2) she was near the end of her term, and (3) the softball

program needed to move in a new direction and had not been successful. Doc. 20-6 at 273:11–17 & 274:19–20.

The suspension of Hall is distinct from her termination because the suspension was justified by ASU solely on the basis of athlete safety, while other reasons were given for her termination. Hall has disputed the truthfulness the misconduct allegations against her, but she has presented no evidence to call into question the articulated reason that she was terminated because the softball program was not successful. "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007). Whether Hall should have been terminated while charges with the NCAA were still pending based on the performance of the softball team is not for this court to decide. "[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable employer." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007). Therefore, even assuming that Hall stated a *prima facie* case of termination, she has not sufficiently created a question of fact as to pretext, and summary judgment is due to be GRANTED as to this aspect of Hall's claim.

### 3. *Difference in Program Budgets*

Hall states that the baseball team received a larger operating budget for recruitment travel and team travel, and that the baseball team had a tutor while the softball team was not given a budget equivalent to the baseball program. Hall further maintains that during

her career she requested gender equity in the budgeting for recruiting, travel, and materials and that ASU continued to provide the baseball team with greater support than the softball team.

ASU first questions whether the budget of the softball program is a term or condition of Hall's employment. To the extent that specific aspects of funding impacted Hall's terms and conditions of employment, however, the court will consider them. *See Hooker v. Tufts Univ.*, 581 F. Supp. 98, 103 (D. Mass. 1983) (stating that "plaintiff remained free to present comparative evidence as to budgets and expenditures in the physical education department, to the extent that such evidence bears directly upon the terms and conditions of plaintiff's employment").

ASU next argues that even assuming a claim can be based on program budgets there are differences in the softball and baseball programs that justify differential funding. ASU presents evidence that the baseball team has a roster of 35 players (Doc. 20-10 at 70:2–4), whereas the softball team has approximately 18 (Doc. 20-2 at 28:9–11), so ASU does not budget the same amounts for recruitment travel or for team travel. ASU's evidence also indicates that the baseball team tutor was a volunteer. Doc. 20-6 at 340:22–341:3.

Hall does not point to evidence to refute the reasons for funding differences in the budgets for the two programs. She argues that ASU's reliance on the success of its sports teams to justify a smaller budget employs circular logic in that it impairs the program with the smaller budget, but this does not undermine the evidence that less money is needed for a smaller team. Again, pretext cannot be established merely by questioning the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable

employer. *Springer*, 509 F.3d at 1350. The court concludes, therefore, that Hall has failed to create a question of fact, and summary judgment is due to be GRANTED as to this aspect of her claim.

### 4. *Difference in Base Pay and Total Salary*

There are two components of Hall's claim based on a difference in pay. She claims both that her base pay and a denial of performance-based incentives were discriminatory on the basis of her gender.

### a. **Base Pay**

To state a *prima facie* case of wage discrimination under Title VII, Hall must show that: (1) she belongs to a protected class; (2) she received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) she was qualified to receive a higher wage. *Walker v. Fulton Cty. Sch. Dist.*, 624 F. App'x 683, 686 (11th Cir. 2015).

ASU does not dispute that the baseball coaches' base pay rates were higher than Hall's, but argues that it is entitled to summary judgment nonetheless. The evidence before the court is that Melendez negotiated his salary with Danley, the Athletic Director, upon his hiring as baseball head coach. *See* Doc. 20-6 at 91:21–23. ASU cites baseball coach Vazquez' deposition for the proposition that a coach's qualifications and success determine the market rate of pay. *See* Doc. 20-10 at 218:2–19. Vasquez also testified that his salary as an assistant coach was set by Melendez and based on what Melendez was provided in the salary pool. Doc. 20-10 at 52–3. In other words, the assistant coach salary came out of a pool of money negotiated by the head coach.

ASU points to evidence of Melendez' 12 years of previous experience and the performance of the baseball team, as compared with Hall's six years of previous experience and the 62 wins and 150 losses of the softball team. Doc. 20-3. Specifically, ASU points to Melendez' 378 career wins and conference championships at his previous employer and the fact that his student athletes excelled with a career GPA for his teams of over a 3.0. Doc. 20-9 at 69. ASU argues that the differences between Melendez and Hall undermine her *prima facie* case, but also serve as a legitimate, non-discriminatory reason for giving Melendez different terms and conditions because a coach's qualifications and success determine what the market will pay, and Melendez had the ability to negotiate a higher salary and total dollar amount for his assistant salary pool.

Hall maintains that ASU's argument that she is not similarly situated to the male baseball coaches places too high a burden on her because she has brought a Title VII claim, not an Equal Pay Act claim. She says that it is sufficient that her job title is the same and that she performed the same tasks as her comparator. Hall states that as head coach of softball, she was responsible for all aspects of her program including budgeting and managing the program, counseling, and coaching. She further states that she had more job responsibilities than the associate and assistant baseball coaches who were paid more than she was paid.

First, with respect to the associate and assistant baseball coaches, the undisputed evidence is that their salaries were set by the head coach, with approval, from within a pool of money appropriated to the head coach. Therefore, regardless of their job duties, the pay of the assistant coaches is not determined in the same way as a head coach. The court

cannot conclude, therefore, that the assistant and associate baseball coaches are appropriate comparators for Hall.

Second, as to the baseball head coach, the court agrees with Hall that the undisputed evidence of the head coach duties, which is applicable to all head coaches at ASU, shows that they were similar enough to create a question of fact to establish a *prima facie* case.

As noted, ASU has articulated the reason for the difference in salary for Melendez and for the larger salary pool for assistant coaches that Melendez' experience and success allowed him to negotiate. Hall disputes the wisdom of ASU's decision not to provide assistant coaches so that Hall could improve the softball program. Hall also argues that there was an agreement with the OCR that required ASU to comply with Title IX, so the articulated reason should not be accepted. But Hall does not dispute that Melendez had a more extensive background and better success.

ASU has presented evidence that Melendez' experience and success allowed him to negotiate a rate of pay and a pool for salaries for assistant coaches that exceeded that of Hall. ASU also contends that the July 24, 2013 OCR Resolution Agreement only required ASU to "improve its hiring practices to attract more qualified coaches to the women's programs, by seeking coaches with more coaching experience by increasing compensation packages and other conditions of employment so that the positions offered are equivalent to those provided to coaches hired for the men's teams," but did not require that Hall's salary be increased. Doc. 26-8 at 191.

Under Eleventh Circuit law, a plaintiff cannot substitute her business judgment for that of the employer, and a court does not sit as a super-personnel department to re-examine

business decisions. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). Hall's arguments question whether ASU should have relied on Melendez' experience and success but do not undermine the evidence that ASU relied on those factors. Hall's argument regarding ASU's OCR agreement regarding future hiring also does not establish that ASU was violating the law or its agreement by considering relative qualifications of its current coaches. This court cannot conclude, therefore, that a sufficient question of fact as to pretext exists. Summary judgment is due to be GRANTED as to the gender discrimination in pay claim.

### b. Performance-Based Incentives

Hall claims in her complaint that she was denied performance-based incentives that were provided to Melendez. Doc. 1 at 10. In her brief in opposition to summary judgment, Hall states that her contract in 2007 and 2008 did not contain performance-based bonuses, she was denied a request to have an increase in salary in 2011, and in February 2013 she signed a new contract with some performance bonuses, but not as many as Melendez. Hall states that Melendez had 21 different bonus and performance bonus opportunities including a bonus for advancing to the college World Series, for winning the SWAC Eastern Division, and higher amounts of bonus for winning the SWAC Championship and exceeding team APR. Hall also points out that ASU has not addressed why male baseball coaches were given the opportunities for performance-based bonuses when Hall was not. Doc. 35 at 52. Hall speculates that ASU would rely on Melendez' experience to justify the difference had it addressed this part of her claim. Doc. 35 at 52.

A defendant's burden in articulating a legitimate, non-discriminatory reason for an adverse employment decision is exceedingly light. *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994). The employer need only offer admissible evidence sufficient to raise a genuine issue of fact as to whether it had a legitimate reason for not hiring the plaintiff. *Id.* Although the burden is one of production, not persuasion, the employer does have to produce a reason for the employment action that was available to it at the time of the decision. *Id.* Upon review of the voluminous initial brief, reply brief, and evidence offered by ASU in support of its motion, the court is unable to find any discussion or citation to evidence relating to a reason for the denial of performance-based bonuses. The court must conclude, therefore, that ASU did not meet its burden in moving for summary judgment as to this aspect of the claim, and the motion is due to be DENIED as to Hall's claim that she was denied performance-based bonuses because of her gender.

**B.     Title VII Retaliation Claims**

Title VII prohibits employers from retaliating against employee because she has opposed any practice made an unlawful employment practice by Title VII or has made a charge under Title VII. 42 U.S.C. § 2000e–3(a). The *McDonnell Douglas* burden-shifting analysis applies to retaliation claims based on circumstantial evidence. *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016).

To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). Once a plaintiff

establishes a *prima facie* case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). Then the burden shifts to the plaintiff to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions." *Id.* Additionally, a plaintiff must proffer evidence "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Southwestern Med. Center v. Nassar*, 570 U.S. 338, 352 (2013).

Count II of the Amended Complaint alleges that the employment actions taken against Hall were in retaliation for Hall's protected activity. In her brief, Hall clarifies that she contends that ASU retaliated against her by suspending her, by giving her less pay and a smaller program budget, and by terminating her employment. Doc. 35 at 59, 64 & 65.

### 1.    *Difference in Treatment in Suspension and Termination*

ASU does not dispute that Hall engaged in protected activity but states that Hall's being placed on administrative leave with pay and being removed from her teaching duties was not an adverse employment action because Hall's salary remained the same.

The standard for evaluating whether an employment action is adverse for purposes of a retaliation claim does necessarily depend on whether pay is impacted, but instead requires that a reasonable employee would have found the challenged action "materially adverse, in that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington No. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Hall states that she was banned from campus and from both her coaching position and her teaching position and from her own classes that she was taking as a

student. The court agrees that there is at least a question of fact as to whether Hall's suspension was an adverse employment action. There is no question that her termination from employment was an adverse employment action.

An additional issue specific to Hall's retaliation claims distinguishes her retaliation in suspension and termination claims from her gender-based claims. ASU contends that Hall cannot establish a causal connection between protected activity and her termination from employment because her protected activities were too remote in time from the decision to terminate her. Hall submitted a letter of grievance to Danley on November 16, 2011; a Title IX grievance on January 31, 2012; and an EEOC Charge on February 22, 2013. Doc. 26-7 at 141:17–142: 21. The evidence is undisputed that Hall was suspended from employment in March 2014 and that Hines recommended her termination on April 28, 2014. *See* Doc. 20-9. Hall responds that she had engaged in a campaign of protected activity that spanned nearly three years and had a pending EEOC charge at the time she was placed on administrative leave. Doc. 35 at 65.

In the absence of direct evidence, the burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action. *See Brungart v. BellSouth Telecomm., Inc*., 231 F.3d 791, 798–99 (11th Cir. 2000). The standard for measuring the closeness of temporal proximity is not whether a complaint is still pending at the time of the adverse employment action, but whether "the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co*., 197 F.3d 1322, 1337 (11th Cir. 1999). In this case, the

evidence is that the decision was made to suspend Hall in March 2014 and to terminate her employment in April 2014, and her last protected activity before termination was in February 2013. Even a "three to four month disparity between the statutorily protected expression and the adverse employment action is not enough" to establish causation. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). The amount of time which elapsed between Hall's last protected activity and the adverse employment actions against her does not satisfy the Eleventh Circuit's close temporal proximity standard. *Id.* The court cannot conclude that there is a *prima facie* case of retaliation in suspension or termination. Summary judgment is due to be GRANTED on these aspects of Hall's retaliation claim.

### 2. *Program Budget and Pay*

ASU contends that Hall cannot establish a *prima facie* case of retaliation in her pay because she cannot show that there is a causal connection between her protected activity and not receiving the same salary and program budget as the male baseball coaches. ASU states that Hall requested a salary increase in 2011; submitted a letter of grievance to former Athletic Director Stacy Danley on November 16, 2011; and submitted a Title IX grievance on January 31, 2012. ASU contends that Hall did not complain about discrimination until after she had made requests for a salary increase, so that the denial of the benefits was before the protected activity.

Hall's position is that ASU gave her a raise in 2013 and could have given it to her at any point after she started asking for an increase in 2011. Doc. 35 at 65. Hall's theory, therefore, appears to be that after she complained in 2011 until she was given an increase

in 2013, the failure to give her an increase and bonuses was in retaliation for earlier complaints. Hall also claims that although she was given some opportunity for performance-based bonuses she was not given the same opportunity as Melendez.

ASU has offered a legitimate non-discriminatory reason for paying Hall less in salary than the head coach and associate and assistant coaches for baseball—namely, that the baseball team had better performance and Melendez, the head coach, had more experience as a coach. As noted above, ASU also has articulated a reason for the differences in the budgets for the two programs. As previously discussed, under Eleventh Circuit law, a plaintiff cannot substitute her business judgment for that of the employer, and the court's role is not to re-examine business decisions. *Chapman*, 229 F.3d at 1030. Hall's arguments question whether ASU should have relied on Melendez' experience and success and should have allocated more resources to the larger team, but do not undermine that ASU relied on those factors. Therefore, the court finds that Hall has not created a question of fact as to pretext so as to preclude summary judgment on the salary and budget claims.

As discussed above, however, ASU has not given a reason for the denial of performance-based bonuses to Hall. While the burden to articulate a legitimate non-retaliatory reason for an employment action is exceedingly light, *Turnes*, 36 F.3d at 1061, by failing to address this claim at all, ASU has not met that light burden. The court concludes that ASU's failure to meet its burden of production in moving for summary

judgment precludes summary judgment on the claim that ASU retaliated against Hall in the denial of performance bonuses.[3]

## V. CONCLUSION

For the foregoing reasons, it is ORDERED that the Motion for Summary Judgment (Doc. 20) is due to be and is hereby GRANTED in part and DENIED in part as follows:

1.     The Motion (Doc. 20) is DENIED as to Hall's claims for gender discrimination in suspension from coaching and in denial of performance-based bonuses and as to her retaliation claim based on denial of performance-based bonuses.

2.     The Motion is GRANTED as to all other claims, and judgment is entered in favor of ASU and against Hall on those claims.

DONE this 27th day of August, 2018.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

---

[3] ASU also has advanced no argument for summary judgment on the basis of "but for" causation.