IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TELMA HALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:16-cv-593-GMB |
| | ) | |
| ALABAMA STATE UNIVERSITY, | ) | [WO] |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is a Motion for Summary Judgment filed by Defendant Alabama State University ("ASU"). Doc. 20.[1] Plaintiff Telma Hall filed this lawsuit on July 19, 2016, alleging discrimination on the basis of her gender and retaliation for complaining about different treatment on the basis of gender in violation of 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Doc. 1.[2] Specifically, Hall, who formerly served as ASU's head softball coach, brings a claim of discrimination on the basis of gender for the following actions: paying her less than similarly situated male employees, denying her contracts with the same terms and benefits, providing her sport with less financial support, suspending her, terminating her employment, failing to follow university policies, and

---

[1] The court's initial ruling on the pending motion for summary judgment was vacated on October 9, 2018. Doc. 58. In ruling on the pending motion in this Memorandum Opinion and Order, the court has considered all of the briefs in support of and in opposition to the summary judgment motion, including the briefs filed after this court's now-vacated order. Doc. 52, 54, 55 & 57.

[2] Although ASU's motion refers to a claim under the Equal Pay Act, Hall clarifies in her opposition brief that she brings two types of claims in her complaint: discrimination on the basis of gender and retaliation in violation of Title VII. Doc. 35 at 1.

subjecting her to stricter scrutiny (Count I), and a claim of retaliation also based on actions taken against her during her employment (Count II). The parties have consented to jurisdiction in this court pursuant to 28 U.S.C. § 636(c). After careful consideration of the parties' submissions, the applicable law, and the record as a whole, the court finds that the Motion for Summary Judgment (Doc. 20) is due to be GRANTED in part and DENIED in part.

## I. JURISDICTION AND VENUE

The court has subject-matter jurisdiction over the claims in this action pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations to support both.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment

may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

### III. FACTS

The facts, taken in a light most favorable to the non-movant, are as follows:

Hall was a female employee of ASU who served as the softball head coach from October 17, 2005 until May 2, 2014. Hall also served as an adjunct professor beginning in the summer of 2013, teaching physical education and wellness classes. Doc. 26-1 at 28:20–29:3. During her tenure, Hall served first under Athletic Director Stacy Danley and then Athletic Director Melvin Hines. Doc. 26-1 at 68:1–13.

As an adjunct professor, Hall was a part-time, at-will employee. The length of a contract for an adjunct professor is one semester.[3] As a coach, Hall was classified as a Special Athletic Appointee. Doc. 20-3 at 15. Head coaches at ASU are responsible for their programs, including recruiting, making sure athletes have a rewarding experience, requesting budgets, and reporting NCAA violations. Doc. 20-6 at 42 & 102:19–103:12.

Salaries and fringe benefits of coaches at ASU are set when the coaches are hired. Each head coach is given a salary pool that the head coach can divide among the number of paid assistant coaches the NCAA allows for that sport. Doc. 20-6 at 105:6–16. ASU's President and Board of Trustees have to approve the assistant coach salaries, however. Each sports team's travel and recruitment budgets are established with a specific amount

---

[3]  The deposition of Willie Dixon, cited by ASU as Exhibit 5 (Doc. 20-1 at 18), appears to be omitted from its submission. ASU's exhibits were grouped together when filed and cannot be accessed by exhibit number, but it appears that Doc. 20-3 skips from Exhibit 4 starting at page 9 to Exhibit 6 on page 11. The court has accessed Dixon's deposition in Hall's submissions.

set out in the total sport budget. Doc. 20-6 at 57:23–58:20.

Hall was hired at a salary of $34,000 a year with no performance-based bonuses and no car allowance. Doc. 26-5 at 119.

In June 2011, Hall made a request that the salary of the softball assistant coach be increased. Doc. 26-8 at 142. In July of that year, she emailed Danley, who was then the Athletic Director, about increasing the budget and salaries for the softball program. Doc. 26-8 at 144. Hall had been making $38,079 since October 1, 2007, but her salary was raised to $45,000. Doc. 26-5 at 122:23–123:2.

Mervyl Melendez was a male employee of ASU who was hired as the baseball head coach in 2011 at a base annual salary of $125,000 with a car allowance, a signing bonus, and additional bonuses and performance bonus opportunities. Doc. 26-5 at 124. Jose Vazquez and Drew Clark were hired as Associate and Assistant Coaches for baseball, respectively. Vazquez was hired at $80,000 per year and Clark was hired at $40,000 per year. Doc. 26-5 at 115.

In November 2011, Hall filed a complaint with Danley about gender equity and salary concerns related to the softball program.

In January 2012, Hall filed an internal Title IX complaint (Doc. 20-3 at 43), which was denied on April 12, 2012, and she was told that there is no avenue for appealing that decision. Doc. 26-8 at 173.

Hines became Acting Athletic Director in September 2012. He was hired into the position of Athletic Director in 2014.

In February 2013, Hall filed an EEOC charge alleging gender discrimination in pay

and terms of employment. Doc. 26-8. In her EEOC charge, Hall complained that the baseball head coach had a salary of $125,000 in 2012, whereas Hall's salary was $38,079 and she did not have bonuses.

Hall then signed her first contract that included both performance-based bonuses for her and her assistant coaches and a car allowance. Doc. 26-5 at 122. One bonus was based on the Academic Progress Rate ("APR") of the athletes. Doc. 26-5 at 122. Melendez's contract still included bonuses and bonus opportunities that Hall's contract did not contain. Doc. 26-5 at 124.

A July 24, 2013 Office of Civil Rights ("OCR") Resolution Agreement entered into by ASU required it to "improve its hiring practices to attract more qualified coaches to the women's programs, by seeking coaches with more coaching experience by increasing compensation packages and other conditions of employment so that the positions offered are equivalent to those provided to coaches hired for the men's teams," but did not require that Hall's salary be increased. Doc. 26-8 at 191–3.

In August 2013, Hines conducted a performance appraisal of Hall and she received a rating of "Requires Improvement" in the areas of quantity and quality of work, and policies and procedures. Doc. 20-2 at 119:7–11. The appraisal noted that Hall's overall record as a softball coach was below 40%. Doc. 20-2 at 119:12–17. In addition, the APR rate was below the NCAA's requirement. Doc. 20-2 at 119:7–120:17.

In February 2014, Gwendolyn Boyd became the President of ASU. Doc. 26-3 at 106:10–13.

On March 2, 2014, the first of two parents complaining about Hall sent an e-mail to

ASU. Doc. 20-2 at 127:3–18. The second e-mail complaint followed on March 3, 2014. Doc. 20-2 at 135:17–22. The parents' complaints included allegations that Hall did not provide sufficient food to the athletes during team travel, that athletes were left on a bus, and that practice hours prevented students from eating in the cafeteria. Doc. 20-2 at 129:2–23 & 138:10–14.

On March 4, 2014, ASU sent a letter to Hall placing her on administrative leave with pay. Doc. 26-1 at 80. The letter further stated that Hall was not "to contact any student at Alabama State University." Doc. 26-1 at 80. It is undisputed that Hall was not allowed on campus to teach or to continue to take her own graduate-level classes.

Hall testified in her deposition that while she was at ASU, the tennis coach and a baseball coach, Larry Watkins, were allowed to teach classes after they had been removed as coaches. Doc. 26-1 at 258:8–12.

Willie Dixon, the Director of Human Resources at ASU, testified in deposition that whether a coach who also is a teacher would be entitled to remain on duty as a teacher if removed as a coach would be a decision for the Provost. Doc. 26-7 at 148:3–13.

Hall presents evidence that a parent complained that Melendez was requiring athletes to use performance-enhancing drugs (Doc. 26-24 at 7) and was investigated for possible NCAA violations, but was not banned from campus or students. Hall also states that Reggie Barlow and Craig Payne, both of whom were football coaches, were investigated after they left ASU for NCAA violations. Hall contends that Brian Jenkins was hired by ASU as a football coach when he had pending allegations of NCAA violations against him.

On April 28, 2014, Hines recommended to John Knight, ASU's Executive Vice President/Chief Operating Officer, that Hall be terminated from her employment. Doc. 20-9. Hall's notice of termination was issued on May 2, 2014. Doc. 26-1. At the time the recommendation for termination was made, the NCAA investigation had not concluded.

On August 7, 2014, Hall amended her EEOC charge to include retaliation.

On October 21, 2016, the NCAA issued an ASU Public Infractions Decision stating that the enforcement staff, institution, and former head softball coach agree that the softball program had exceeded practice time limits imposed by the NCAA. Doc. 26-1 at 86.

## IV. DISCUSSION

### A. Title VII Gender Discrimination Claims

Title VII prohibits an employer from discriminating against an employee on the basis of her gender. *See* 42 U.S.C. § 2000e-2(a)(1). Where, as here, a plaintiff asserts circumstantial evidence of discrimination, the court applies the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Therefore, Hall first must establish a *prima facie* case of employment discrimination, creating a presumption that the employer discriminated against her by showing that (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside of her class more favorably. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. *Crawford,* 529 F.3d 970. If the

employer meets this burden, the plaintiff must then demonstrate that the employer's proffered reason is merely a pretext for discrimination. *Id.*

Hall has identified several different employment actions as being the bases for her gender discrimination claim, including the denial of contracts with the same terms and benefits as male employees, a difference in financial support for female sports, a difference in pay, a difference in treatment by suspending her from coaching and teaching duties, the termination of her employment, subjecting her to stricter scrutiny, and failing to follow university policies.

In examining these employment actions, it appears to the court that Hall's theories of stricter scrutiny and ASU's violation of university policy both relate to her suspension. Therefore, rather than treat each of these as separate claims, the court will address those aspects of her claim together.

### 1. Difference in Treatment in Suspension

Hall brings a claim for disparate treatment based on her suspension from her employment when parents of softball players made allegations against her, stating that she was suspended not only from coaching, but also from being present on campus, that ASU did not follow its policies in suspending her, and that male coaches were not treated in this way.

A plaintiff can establish a *prima facie* case of discrimination in discipline by showing that (1) she is a member of a protected class; (2) she was qualified for the position or benefit sought; (3) she was subjected to an adverse employment action; and (4) she

suffered from a differential application of work or disciplinary rules. *Spivey v. Beverly Enters., Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999).

ASU contends that Hall did not suffer an adverse employment action because she was suspended from her employment with pay. Hall responds that all of the actions taken against her when she was suspended, when viewed together, show that an adverse employment action was taken against her. Hall states that the terms, conditions, and privileges of her employment were altered in several ways. Because she was barred from campus, was unable to participate in the investigation. Hall also stated in her deposition that her removal from her office deprived her of access to her files which could have helped her to answer the allegations. Doc. 26-1 at 61:2–15. Hall further claims that she never had an opportunity to respond to the allegations. Doc. 26-1 at 133:15–23. Hall points to Hines' deposition in which he states that he thinks that an ASU official went to Melendez and asked him about the allegations against him. Doc. 26-5 at 221:2–8. Hall also argues that being banned from campus deprived her of the benefit of employment of tuition-free classes since she could not attend class and obtain a grade for the semester. She also argues that being prevented from teaching her class as an adjunct caused her teaching contract not to be renewed.

To prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). "[I]ncidents can be considered collectively to determine whether they constitute prohibited discrimination." *Brown v. Sybase, Inc.*, 287 F. Supp. 2d 1330, 1343

(S.D. Fla. 2003). There is no *per se* rule in the Eleventh Circuit that suspension with pay cannot be considered an adverse employment action. In fact, albeit in the context of a retaliation claim, the Eleventh Circuit has expressly held that a suspension with pay for 30 days is an adverse employment action. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir. 1993). A district court within this circuit, evaluating a discrimination claim, has collected district court cases and determined that when paid suspension has not been considered to be an adverse employment action the suspension was "for less than a month." *Brown v. Bd. of Regents of the Univ. Sys. of Ga.*, 2016 WL 4925792, at *9 (N.D. Ga. Feb. 12, 2016). Another court has found temporary suspensions with pay to be an adverse employment action. *See Walker v. Georgia*, 2005 WL 8154325, at *20 (N.D. Ga. Aug. 8, 2005) (recommending denial of summary judgment as to discrimination and retaliation claims for suspension and stating that "suspensions from work, although temporary and with pay, were sufficiently adverse because they constituted significant changes in the terms and conditions of Plaintiff's employment"), *adopted*, 2005 WL 8154326 (N.D. Ga. Sept. 23, 2005); *see also McCollough v. Buffalo Elec. Co. of Ala.*, 2017 WL 4222613, at *3 & n.5 (N.D. Ala. Sept. 22, 2017) (noting that there is precedent for the proposition that suspension with pay is an adverse action for purposes of a retaliation claim).

Viewing all of the actions ASU took in suspending Hall—including suspending her from coaching for over a month; barring her from contact with all students, which prevented her from teaching classes and stopped her from taking her own classes; and preventing her from having access to her files—the court concludes this is not a case, like those in other circuits, in which there was a suspension with pay "without more." *See, e.g.,*

11

*Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) ("[A]dministrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action."). Instead, taken together, the circumstances of Hall's suspension constituted a serious and material change in the terms, conditions, or privileges of her employment.

Additionally, this is not a situation in which Hall was restored to her position at the end of the suspension. *See Perez v. Brain*, 2016 WL 607770, at *12 (C.D. Cal. Jan. 8, 2016) (distinguishing cases where placement on paid administrative leave was not an adverse employment action because the plaintiff was reinstated to his or her position at the conclusion of the leave). Instead, she was terminated and one of the reasons offered for her termination was the fact that allegations were pending against her. *Cf. McCollough*, 2017 WL 4222613, at *3 & n.5 (noting that the parties agreed that suspension with pay plus discharge is materially adverse). As noted, Hall has presented evidence that her removal from campus preventing her from accessing files which could have helped her to answer the allegations. Doc. 26-1 at 61:2–15. The court concludes that there is sufficient evidence in the summary-judgment record regarding the circumstances of Hall's suspension to conclude that it was an adverse employment action. *See White v. Sears, Roebuck & Co.*, No. 2006 WL 2443848, at *21 (N.D. Ga. Aug. 21, 2006) (noting that "the various written warnings and other disciplinary actions taken against Plaintiff did lead to the eventual termination of his employment," so that there was an adverse employment action for purposes of a discrimination claim).

As to element four, the "plaintiff . . . must show either (a) that [s]he did not violate the work rule, or (b) that [s]he engaged in misconduct similar to that of a person outside

the protected class, and that the disciplinary measures enforced against h[er] were more severe than those enforced against the other persons who engaged in similar misconduct." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989). The relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies. *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999). "When an individual proves that he was fired but one outside his class was retained although both violated the same work rule, this raises an inference that the rule was discriminatorily applied . . . ." *Id.*

Hall contends that when ASU suspended her without pay and required her to remain away from campus it treated her differently than it had treated male coaches when similar allegations were made against them. When a baseball parent made a complaint against Coach Melendez, Hall argues that Melendez was not suspended, was provided with the allegations against him, and participated in the investigation. Hall also points to Andrew Chatman, the male head coach of the bowling team, and acknowledges that he was suspended for three days without pay, but also states that he was not suspended after allegations of sexual relationships with student athletes. Hall states that football coaches Reggie Barlow and Craig Payne had NCAA violations reported, including violations concerning athlete welfare, and were not suspended during the investigation of the allegations, and that football coach Brian Jenkins was hired even though he had NCAA violations concerning student welfare pending against him. In briefing on new motions, Hall also argues that the NCAA investigated Barlow and Payne in 2012 and 2015. Hall also argues that the Human Resources Manual for ASU does not state that a violation of

NCAA rules must have occurred while the coach was at ASU to remove the coach from a head coaching capacity. Doc. 55 at 14.

The court begins with Melendez, the head baseball coach. A baseball parent alleged "numerous violations of NCAA regulations and federal and state law by Melendez and the baseball program (including, but not limited to, the use of performance enhancing drugs by baseball student-athletes and discrimination against non-Hispanic baseball student athletes)." Doc. 26-24 at 28.

ASU argues that Hall's and Melendez's situations are distinct because the Melendez investigation did not involve a student welfare issue. In her deposition, however, Boyd, the President who approved Hall's suspension, was specifically asked to compare Hall's situation to the hypothetical situation of a baseball coach being accused of asking students to take performance enhancing-drugs, or steroids, and whether that accusation would be enough to suspend a coach pending an investigation. Doc. 20-8 at 120:18–23. Boyd answered, "[p]ending an investigation, absolutely, because that's an NCAA violation." Doc. 20-8 at 120:24–25. When asked about such a complaint being made by a baseball player's father, Boyd answered that the "same action would have been taken as we did with Ms. Hall, immediately remove them from the students by placing them on administrative leave, investigate to find out if it's true, and then take the appropriate action." Doc. 20-8 at 120:24–25 & 121:8–12. Boyd's testimony, therefore, supports a conclusion that the same ASU policy applied to, and was violated by, Melendez and Hall. Drawing all reasonable inferences in favor of the non-movant, a reasonable jury could conclude that Boyd's testimony equates the two employees and makes them sufficient comparators. In other

words, the testimony of Boyd would allow a reasonable jury to conclude that the two employees could be viewed as engaging in the same infraction with a different reaction from ASU.

ASU notes that at the commencement of the Melendez investigation Dr. William Harris was the President of ASU and Stacy Danley was the Athletic Director. ASU argues, that the different decisionmakers are significant because, under Eleventh Circuit law, "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination" because "different supervisors may employ different disciplinary measures." *Silvera v. Orange Cnty. Sch. Bd*., 244 F.3d 1253, 1261 n.5 (11th Cir. 2001). The Eleventh Circuit also has clarified, however, that the presence of two different supervisors is not determinative. *See Anderson v. WBMG-42*, 253 F.3d 561, 566 (11th Cir. 2001) (stating that cited authorities do not stand for the proposition that whenever two different supervisors are involved in administering the disciplinary actions the comparators cannot as a matter of law be similarly situated for Title VII purposes). Although Harris was the President at the commencement of the investigation of Melendez, the evidence before the court is that a report was submitted to the NCAA on Melendez in September 2013 and that an additional report was made in February 2015. Doc. 26-24. Boyd became president in February 2014, which was before the end of Melendez's investigation. The President approved actions of the Athletic Directors. The court cannot conclude, therefore, as a matter of law that the difference in presidents is dispositive. *Cf. Rioux v. City of Atlanta, Ga*., 520 F.3d 1269, 1281 (11th Cir. 2008) (stating that "even as

Appellees contend that Rubin was not directly involved in the investigation of Dunham, they concede it was necessary for him to approve the ultimate sanction imposed").

The court is mindful that comparators accused of a violation of a rule must be nearly identical. *Wilson*, 376 F.3d at 1091. In this case, Boyd, the President of ASU who approved the suspension of Hall and who became President before the end of the investigation of Melendez, testified in her deposition when given a hypothetical question consistent with the evidence concerning a complaint against baseball head coach Melendez that the offender in the hypothetical should have been suspended as Hall was. The court concludes, therefore, that Hall has established a *prima facie* case of disparate treatment in suspension based on Melendez as a comparator.

As noted, Hall also argues that she has established a claim of discrimination by comparing her situation to that of Chatman, the bowling coach, and football coaches Reggie Barlow, Craig Payne, and Brian Jenkins. Unlike Melendez, there is no evidence from an ASU former official that these coaches and Hall were viewed the same. In fact, ASU's position is that these coaches did not engage in similar behavior to Hall because Hall was accused of putting a student in danger such that ASU immediately had to separate her from ASU students. Specifically with respect to the comparators identified by Hall, ASU states that Chatman, the bowling coach, was suspended for three days and the investigation of the complaint against him was handled by Human Resources, not the Athletics Department. Doc. 20-6 at 242. As to Jenkins, ASU initially said that a news reporter disclosed NCAA violations at Jenkins' prior employer, but that ASU had contacted the NCAA and there were no NCAA pending investigations against Jenkins when he was

hired at ASU. Doc. 20-6 at 323:20–23. In response to a motion by Hall, ASU has stated that Jenkins had one NCAA issue while at ASU which resulted in his suspension for one game because one of his assistant coaches made an offer before it was permissible. Doc. 20-6 at 323. ASU states that this infraction, unlike Hall's, did not involve student welfare. ASU also argues that Reggie Barlow and Craig Payne are not proper comparators because a 2015 NCAA investigation of them occurred after their employment with ASU had ended. In response to a new motion by Hall, ASU notes that Barlow had violations during his tenure with ASU, but that the violations did not involve student welfare, and were classified as level III NCAA violations, whereas the violations by the softball team were classified as level II. Doc. 20-5 at 81:1–86:10.

Hall has argued that this court should wait to address the question of comparator similarity because the Eleventh Circuit is taking up a similar issue *en banc*. In the disciplinary context, however, the Eleventh Circuit has held that a "comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). This court applies that standard until instructed otherwise by the Eleventh Circuit and finds that the evidence presented regarding infractions or alleged infractions by Chatmon, Barlow, Payne, and Jenkins is too dissimilar from the NCAA allegations against Hall to create a question of fact as to whether there is a sufficient degree of similarity to Hall's situation to establish a *prima facie* case because Hall's allegations occurred while she was at ASU, they were level II violations, and ASU viewed the allegations to have imperiled student welfare.

Turning now to the claim based on Melendez as a comparator, the court notes that ASU's articulated reason for suspending Hall and removing her from campus is that the allegations against her involved athlete safety. Again, in light of Boyd's deposition testimony regarding allegations against a coach who encouraged steroid use in athletes, discussed above, drawing all reasonable inferences in favor of the non-movant, the court concludes that a reasonable jury could conclude that ASU policies were not followed in suspending Hall and not suspending Melendez. An "employer's deviation from its own standard procedures may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006). The court concludes, therefore, that the evidence is sufficient to call into question the articulated reason for Hall's suspension and that summary judgment is due to be DENIED as to this aspect of Hall's claim.

### 2. Termination

Hall has claimed that she was treated differently from other male coaches with allegations against them because she was terminated and those coaches were not. ASU disputes that any of the coaches she has identified were similarly situated, and also has provided evidence in the form of Hines' deposition that Hines made the recommendation to terminate Hall to John Knight, former Executive Vice President/COO, for three reasons: (1) Hall had pending NCAA violations, (2) she was near the end of her term of employment, and (3) the softball program needed to move in a new direction and was not successful. Doc. 20-6 at 273:11–17, 274:19–20 & 276:5–14.

The suspension of Hall from coaching, teaching, and from her own classes, as compared to the treatment of Melendez, as to which the court has found a question of fact

which precludes summary judgment, is distinct from her termination in that the suspension was justified by ASU solely on the basis of athlete safety whereas other reasons were given for her termination. Hall has disputed the truthfulness of the allegations against her, but she has presented no evidence to call into question the articulated reason that she was terminated because the softball program was not successful. "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007). Whether Hall should have been terminated based on the performance of the softball team is not for this court to decide. "[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable employer." *Springer v. Convergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007).

Hall argues that Hines' articulation of the performance of the softball team as a reason for her termination is not trustworthy because this reason was not previously given to her as a reason for her termination and, therefore, can be viewed as a pretextual "shifting explanation." Although the identification of inconsistencies in an employer's testimony can be evidence of pretext, *see Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926 (11th Cir. 1995), merely offering multiple reasons for a decision, when those reasons are not inconsistent, does not establish pretext. *Tidwell v. Carter Prod.*, 135 F.3d 1422, 1428 (11th Cir. 1998). Even where there is an "additional, but undisclosed, reason for the decision . . . the existence of a possible additional non-discriminatory basis" does not prove pretext.

*Tidwell*, 135 F.3d at 1428. Hines affirmatively states in his deposition that the performance of the softball team was one of the bases for his recommendation that Hall be terminated. Doc. 20-6 at 276:5–14. The other reasons articulated for Hall's termination are not inconsistent with that reason. Therefore, even assuming that Hall stated a *prima facie* case of termination, she has not sufficiently created a question of fact as to pretext, and summary judgment is due to be GRANTED as to this aspect of Hall's claim.

### 3. *Differential Program Budgets*

Hall states that the baseball program received a larger operating budget for recruitment travel and team travel, and that the baseball team had a tutor whereas the softball team was not given an equivalent budget. Hall claims that during her career she requested gender equity in the budgeting for recruiting, travel, and materials and that ASU continued to provide the baseball team with greater support than the softball team.

ASU first responds that, arguably, the budget of the softball program is not a term or condition of Hall's employment. Hall's claim rests in part on the idea that there is discriminatory intent towards the "female sports teams." Doc. 55 at 7. But actions taken against the team on the basis of gender are not actionable for Hall. To the extent that specific aspects of funding impacted Hall's terms and conditions of employment, however, the court will consider them. *Cf. Hooker v. Tufts Univ.*, 581 F. Supp. 98, 103 (D. Mass. 1983) (stating that "plaintiff remained free to present comparative evidence as to budgets and expenditures in the physical education department, to the extent that such evidence bears directly upon the terms and conditions of plaintiff's employment").

ASU argues that, even assuming a claim can be based on program budgets, there are differences in the softball and baseball programs which justify a difference in program funding. ASU presents evidence that the baseball team has a roster of 35 (Doc. 20-10 at 70:2–4), whereas the softball team has at least 18 (Doc. 20-2 at 28:9–11), so ASU does not budget the same amounts for recruitment travel or for team travel. ASU also presents evidence that the baseball team's roster at various periods was three times as much as the softball team because at certain times the softball team had only nine players, not 18. Doc. 20-4 at 101–03. ASU also introduced evidence that the baseball team's tutor was a volunteer. Doc. 20-6 at 340:22–341: 3.

Initially, Hall did not point to evidence to refute the reasons for funding differences in the budgets for the two programs, but instead argued that ASU's reliance on the success of its sports teams to justify a smaller budget is circular because it impairs the program with the smaller budget. That argument does not undermine the evidence that less money was needed for the smaller team. In briefing in support of a new motion, Hall also argues that the amount of money appropriated to baseball is three times as much, whereas the roster is only twice as big. Doc. 55 at 8. As noted, however, ASU has presented affirmative evidence that the baseball team roster was in fact more than twice as large as the softball team during Hall's tenure as coach. Doc. 20-4 at 101–03.

Pretext cannot be established merely by questioning the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable employer. *Springer*, 509 F.3d at 1350. ASU has presented evidence of the differences in the number of players as a reason for the difference in the program budgets and has presented evidence that the

number of baseball players was substantially greater than the number of softball players and that the tutor was a volunteer. The court concludes, therefore, that Hall has failed to create a question of fact, and summary judgment is due to be GRANTED as to this aspect of her claim.

### 4. Differential Compensation

There are two aspects to Hall's claim based on difference in pay. She claims both that her base pay and a denial of performance-based incentives were discriminatory on the basis of her gender.

#### a. Base Pay

To state a *prima facie* case of wage discrimination under Title VII, Hall must show that (1) she belongs to a protected class, (2) she received low wages, (3) similarly situated comparators outside the protected class received higher compensation, and (4) she was qualified to receive a higher wage. *Walker v. Fulton Cty. Sch. Dist.*, 624 F. App'x 683, 686 (11th Cir. 2015).

ASU does not dispute that the baseball coaches' base pay rates were higher than Hall's, but argues that it is entitled to summary judgment nonetheless. The evidence before the court is that when he was hired as head baseball coach Melendez negotiated his salary with Danley, who was the Athletic Director. *See* Doc. 20-6 at 91:21–23. ASU cites baseball coach Vazquez' deposition for the proposition that a coach's qualifications and success determine the market rate of pay. *See* Doc. 20-10 at 218:2–19. Vasquez also testified that Melendez set his salary as an assistant coach and that the salary was based on

what Melendez was provided in the salary pool. Doc. 20-10 at 52–3. In other words, the assistant coach salary came out of a pool of money negotiated by the head coach.

ASU points to evidence of the 12 years of previous experience of Melendez and the performance of the baseball team, as compared to Hall's six years of previous experience and the 62 wins against 150 losses of the softball team. Doc. 20-3. Specifically, ASU points to Melendez's 378 career wins and conference championships at his previous employer, and notes that that his student athletes excelled with a career GPA for his teams of over a 3.0. Doc. 20-9 at 69. ASU argues that the performance and experience differences between Melendez and Hall undermine her *prima facie* case and also serve as a legitimate, non-discriminatory reason for their differing terms and conditions because a coach's qualifications and success determine what the market will pay, allowing Melendez to negotiate a higher salary and total dollar amount for his assistant salary pool.

Hall argues that ASU's argument that she is not similarly situated to the male baseball coaches places too high a burden on her because she has brought a Title VII claim, not an Equal Pay Act claim. She claims that under Title VII she only must show that her job title is the same and that she performed the same tasks as her comparator. Hall states that as head coach of softball, she was responsible for all aspects of her program, including budgeting and managing the program, counseling, and coaching. She further states that she had more job responsibilities than the associate and assistant baseball coaches who were paid more than she was paid.

First, with respect to the associate and assistant baseball coaches, the undisputed evidence is that their salaries were set by the head coach, with approval, from within a pool

of money appropriated to the head coach. Hall states that the pool itself must be approved by the board as the final decisionmaker, so the assistant coaches and Hall are proper comparators. Even though the pool is approved by the board, the pay of the assistant coaches is not determined in the same way as for a head coach. The court cannot conclude, therefore, that the assistant and associate baseball coaches are appropriate comparators for Hall. The challenge to the total pool of money appropriated for salaries is a challenge subsumed in the claim regarding the head coach's salary, to which the court now turns.

The court agrees with Hall that the undisputed evidence of the head coach duties, which is applicable to all head coaches at ASU, shows that Hall and the head baseball coach were similar enough to create a question of fact to establish a *prima facie* case.

As noted, ASU has articulated the reason for the difference in salary by noting that Melendez' experience and success allowed him to negotiate for higher amounts. Hall responds that Melendez's record in 2011–2012 was only 20 wins and 36 losses. Hall also disputes the wisdom of ASU's decision not to hire assistant coaches so that Hall could improve the softball program. Hall additionally argues that there was an agreement with the Office of Civil Rights that required ASU to comply with Title IX, so the articulated reason should not be accepted.

 ASU responds that in Melendez's first year the team consisted of players he did not recruit, but in 2012–2013 the team's record improved to 32-25 and it won the division championship, and in 2013–2014 the team won 35 games and the division championship. Doc. 20-10 at 208. ASU also contends that the July 24, 2013 OCR Resolution Agreement only required ASU to "improve its hiring practices to attract more qualified coaches to the

women's programs, by seeking coaches with more coaching experience by increasing compensation packages and other conditions of employment so that the positions offered are equivalent to those provided to coaches hired for the men's teams," but did not require that Hall's salary be increased. Doc. 26-8 at 191.

Under Eleventh Circuit law, a plaintiff cannot substitute her business judgment for an employer's, and a court does not sit as a super-personnel department to re-examine business decisions. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). Merely questioning the wisdom of a reason is not sufficient as long as the reason is one that might motivate a reasonable employer. *Springer*, 509 F.3d at 1350. Hall's arguments question whether ASU should have relied on Melendez' experience and success but do not undermine ASU's reliance on those factors. ASU's OCR agreement relating to future hiring practices also does not establish that ASU was violating the law, or its agreement, by considering the relative qualifications of its current coaches. This court cannot conclude, therefore, that a sufficient question of fact as to pretext exists. Summary judgment is due to be GRANTED as to Hall's gender discrimination in pay claim.

### b.  Performance Incentives

Hall complains that she was denied performance-based incentives that were provided to Melendez. Doc. 1 at 10. In her brief in opposition to summary judgment, Hall states that her contract in 2007–2008 did not contain performance-based bonuses, that she was denied a request to have an increase in salary in 2011, and that in February 2013 she signed a new contract which contained some performance bonuses but not as many as Melendez. Hall states that Melendez had 21 different bonus and performance bonus

opportunities including a bonus for advancing to the college World Series, for winning the SWAC Eastern Division, and higher amounts of bonus for winning the SWAC Championship and exceeding team APR. Hall argues that ASU has failed to articulate a legitimate, non-discriminatory reason for the denial of performance-based incentives. Doc. 35 at 52.

A defendant's burden in articulating a legitimate, non-discriminatory reason for an adverse employment decision is exceedingly light. *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994). The employer need only offer admissible evidence sufficient to raise a genuine issue of fact as to whether it had a legitimate reason for not hiring the plaintiff. *Id.* In its initial brief in support of its motion, ASU did not discuss a reason for the denial of performance-based bonuses. In briefing in support of an additional motion, however, ASU clarifies that it intended to address the reasons for differential performance-based incentives by addressing the reasons for Hall's and Melendez's contract terms. Doc. 52 at 7. Because Hall responded to that evidence in her brief, the court will address Hall's pretext arguments.

Hall contends that experience or a previous record are irrelevant to in-season performance, which would give rise to the bonuses, and therefore reliance on experience or a previous record in setting performance-based bonuses is pretextual. The court has already addressed the record evidence supporting ASU's reasons for the different salary pools. For the same reasons that the court cannot conclude that a sufficient question of fact has been raised as to the reasons given for the difference in pay, the court also concludes that Hall has not established pretext as to the performance-based incentives claim. Under

Eleventh Circuit law, questioning the wisdom of a reason is not sufficient if the reason is one that might motivate a reasonable employer. *Springer*, 509 F.3d at 1350. Summary judgment is due to be GRANTED as to this aspect of Hall's claim.

**B.     Title VII Retaliation Claims**

Title VII prohibits an employer from retaliating against an employee because she has opposed any practice made an unlawful employment practice by Title VII or has made a charge under Title VII. 42 U.S.C. § 2000e–3(a). The *McDonnell Douglas* burden-shifting analysis applies to retaliation claims based on circumstantial evidence. *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016).

To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show (1) that she engaged in statutorily protected expression, (2) that she suffered an adverse employment action, and (3) that there is some causal relationship between the two events. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). Once a plaintiff establishes a *prima facie* case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). Then the burden shifts to the plaintiff to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions." *Id.* Additionally, a plaintiff must proffer evidence "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Southwestern Med. Center v. Nassar*, 570 U.S. 338, 352 (2013).

Count II of the Amended Complaint alleges that the employment actions taken against Hall were in retaliation for Hall's protected activity. In her brief, Hall clarifies that

she contends that ASU retaliated against her by suspending her, by giving her less pay and a smaller program budget, and by terminating her employment. Doc. 35 at 59, 64 & 65.

### *1. Suspension and Termination*

ASU does not dispute that Hall engaged in protected activity but states that Hall's administrative leave and removal from her teaching duties was not an adverse employment action because her salary remained the same.

The standard for evaluating whether an employment action is adverse for purposes of a retaliation claim does not require that pay be impacted, but instead requires that a reasonable employee would have found the challenged action "materially adverse, in that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington No. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Hall states that she was banned from campus, from both her coaching position and her teaching position, and from her own classes that she was taking as a student. The court agrees for summary-judgment purposes that Hall's suspension was an adverse employment action. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir. 1993). There is no question that her termination from employment was an adverse employment action.

An issue specific to Hall's retaliation claims distinguishes her retaliation in suspension and termination claims from her gender-based claims. ASU contends that Hall cannot establish a causal connection between protected activity and her suspension and termination from employment because her protected activities were too remote in time from the decision to terminate her. Hall submitted a letter of grievance on November 16, 2011; a Title IX grievance on January 31, 2012; and an EEOC Charge on February 22,

2013. Doc. 26-7 at 141:17–142:21. The evidence is undisputed that Hall was suspended from employment in March 2014; that on April 28, 2014 Hines recommended that she be terminated; and that her Notice of Termination was issued on May 2, 2014. *See* Doc. 20-9.

Hall responds to ASU's causal connection argument by stating that she had engaged in a campaign of protected activity that spanned nearly three years and had a pending EEOC charge at the time she was placed on administrative leave. Doc. 35 at 65.

The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action. *See Brungart v. BellSouth Telecomm., Inc*., 231 F.3d 791, 798–99 (11th Cir. 2000). The standard for measuring the closeness of temporal proximity is not whether a complaint is pending at the time of the adverse employment action, but whether the decisionmaker "became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co*., 197 F.3d 1322, 1337 (11th Cir. 1999). In this case, the evidence is that the decision was made to suspend Hall in March 2014 and to terminate her employment in April 2014, while her last protected activity before termination was an EEOC charge made in February 2013. "A three to four month disparity between the statutorily protected expression and the adverse employment action is not" sufficiently close to establish causation. *Thomas*, 506 F.3d at 1364. The amount of time that elapsed between Hall's last protected activity and the adverse employment actions against her far exceeded three to four months and, therefore, Hall cannot satisfy the Eleventh Circuit's close temporal proximity standard. *Id.* The court

cannot conclude that there is a *prima facie* case of retaliation in suspension or termination. Summary judgment is due to be GRANTED on these aspects of Hall's retaliation claim.

## 2. *Program Budget and Pay*

ASU contends that Hall cannot establish a *prima facie* case of retaliation in her pay because she cannot show that there is a causal connection between her protected activity and her smaller salary and program budget in comparison to the male baseball coaches. ASU states that Hall requested a salary increase in 2011, submitted a letter of grievance to former Athletic Director Stacy Danley on November 16, 2011, and submitted a Title IX grievance on January 31, 2012. ASU contends that Hall did not complain about discrimination until after she had made requests for a salary increase, so that the denial of the benefits was before the protected activity.

Hall's initial position was that ASU gave her a raise in 2013 and could have given her a raise at any point after she started asking for an increase in 2011. Doc. 35 at 65. Hall also claims that although she was given some opportunities for performance-based bonuses, she was not given the same opportunities as Melendez. The bonuses also are part of the budget-approval process. In later briefing, Hall clarified that she contends that the ASU Board of Trustee's approval of budgets and salaries for 2012–2013 is causally connected to her January 31, 2012 Title IX grievance and that the approval of budgets for 2014 is casually connected to her February 22, 2013 EEOC charge. Doc. 55 at 21.

ASU states that its fiscal year starts on October 1 of each year, so the budget for 2012–2013 was approved in October 2012, eight months after the identified protected activity of the January Title IX grievance. ASU also states that the budget for 2013–2014

was approved in October 2013, seven months after the EEOC charge in February 2013. In response, Hall has argued that even though the fiscal year starts on October 1 action is taken toward budget approval before that time, so her protected activities are sufficiently close in time to the budget decisions.

The relevant record evidence consists of deposition testimony by Hines in which he states that ASU budgets are due in the spring but "the date fluctuates from year to year." Doc. 26-5 at 61:19–22. Hines states that one year the budgets may be due in March and the next year they may be due in April. Doc. 26-5 at 61:19–63:2. Hines also explains in his deposition that the coaches put their budgets together and then the budget is submitted to the budget officer. Doc. 26-5 at 62:11–23. After that, a presentation is made to the president about the budget. Doc. 26-5 at 63:9–13.

As noted, temporal proximity must be close to establish causation and a three-to-four-month gap is not sufficiently close under Eleventh Circuit law. *See Thomas*, 506 F.3d at 1364. The evidence before the court is that ASU budget proposals are due sometime in the spring, which would be in March or April. A budget decision made in April could be three months after a protected activity engaged in in January and, therefore, too remote in time to establish causation. *Id*. Additionally, the evidence before the court is that ASU budgets are considered at various stages in the process before being adopted in October. Hall has not provided evidence as to when a particular budget decision actually was made. Accordingly, in light of the lack of any specific date before October, and the undisputed evidence that budgets are approved by ASU in October, the court cannot conclude that Hall has created a question of fact as to causation as to her program budget and pay, including

performance-based bonuses, claims. Summary judgment is, therefore, due to be GRANTED as to those claims.

## V. CONCLUSION

For the foregoing reasons, it is ORDERED that the Motion for Summary Judgment (Doc. 20) is due to be and is hereby GRANTED in part and DENIED in part as follows:

1.    The Motion (Doc. 20) is DENIED as to Hall's claim for gender discrimination in suspension from employment.

2.    The Motion is GRANTED as to all other claims, and judgment is entered in favor of ASU and against Hall on those claims.

DONE this 8th day of January, 2019.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE