IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

TELMA O. HALL,                          )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )   CASE NO. 2:16-cv-593-JTA
                                        )
ALABAMA STATE UNIVERSITY,               )
                                        )
            Defendant.                  )

## MEMORANDUM OPINION AND ORDER

Before the Court are the following motions: Plaintiff Telma O. Hall's Motion to Amend the Final Judgment (Doc. No. 198) and Defendant Alabama State University's ("ASU's") Renewed Motion for Judgment Notwithstanding the Verdict or, in the Alternative, Motion for a New Trial (Doc. No. 199). For the reasons stated below, the Court concludes that (1) Hall's Motion to Amend the Final Judgment (Doc. No. 198) is due to be DENIED; (2) ASU's Motion for Judgment Notwithstanding the Verdict (Doc. No. 199) should be CONSTRUED as containing a Rule 59(e) motion to alter or amend the judgment to reduce the compensatory damages to $300,000.00 in accordance with 42 U.S.C. § 1981a(3); (3) ASU's Rule 59(e) motion to reduce the compensatory damages to $300,000.00 is due to be GRANTED; (4) in all other respects, ASU's Motion for Judgment Notwithstanding the Verdict (Doc. No. 199) is due to be DENIED; and (5) ASU's Alternative Motion for a New Trial (Doc. No. 199) is due to be DENIED.

## I.     JURISDICTION

This Court exercises subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue, and the Court finds sufficient allegations to support both in the Middle District of Alabama. The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Docs. No. 10, 11.)

## II.     FACTS[1]

A.     Hall's Suspension

In May 2003, Hall, an African-American woman, obtained a Bachelor of Science in Physical Education at ASU. (Doc. No. 207 at 26.) While pursuing her bachelor's degree, Hall was a student athlete on the school's softball team. (*Id*.) She then taught middle school physical education for a year before being hired as head softball coach for Alcorn State University, one of ASU's rival schools. (*Id*. at 32.) Alcorn had a losing season the year before Hall arrived to coach, but within a year, she was able to accomplish "a really big turnaround for that program." (*Id*.) That year, Alcorn beat ASU. (*Id*.) The position for head softball coach had opened at ASU, and Hall was encouraged to apply, which she did. (*Id*.) On October 2005, ASU hired Hall as head softball coach. (*Id*. at 26.) When asked how she

---

[1] In accordance with the standards of review for considering a renewed motion for judgment as a matter of law and motion for new trial, this statement of facts is based on the evidence presented at trial as viewed in the light most favorable to Hall because she prevailed at trial. At all points where the court was required to consider whether the jury's verdict was against the great weight of the evidence, the court considered all the evidence in accordance with the applicable standard of review, and not just the evidence that favored Hall.

felt about being hired to coach at ASU after her successful season coaching at Alcorn, Hall

testified:

> I mean, as a former athlete, a former student, I mean, when they -- at that point, saying that I bleed black and gold, that's an understatement. What other opportunity would you have to not only come back and, one, beat your *alma mater* but then turn around and come back to coach your *alma mater*? I mean, for me, it was -- it was almost like a surreal dream that came true.

(*Id.* at 33.)

In August of 2013, Hall received a Master of Education degree from ASU. (*Id.*) In

2013 and 2014, ASU employed Hall as an adjunct professor. (*Id.*) Her job duties as adjunct

professor were not related to her head coaching duties, which she also continued to

perform. (Doc. No. 209 at 46.) She received additional pay for her work as an adjunct

professor. (*Id.*) Hall remained head softball coach until the spring of 2014. (*Id.*) In 2014,

Hall was also taking classes at ASU as a student in health information management. (Doc.

No. 207 at 49.)

As head softball coach, Hall reported directly to the athletic director, who, in 2014,

was Melvin Hines.[2] (*Id.* at 35.) Hines, in turn, reported directly to the executive vice

president, John Knight. (*Id.*) Decisions by the athletic director (Hines) had to be approved

by Knight. (*Id.* at 35-36.)

On March 3, 2014, Melvin Hines informed Hall she was suspended from

employment, but did not tell her why. (*Id.* at 39.) Hines had made the recommendation,

---

[2] From February 23, 2011, to August 30, 2012, Hines served as senior associate athletic director. (Doc. No. 207 at 27.) From August 30, 2012, to August 31, 2015, he served as interim athletic director. (*Id.*) Thereafter, he served as athletic director. (*Id.*)

and it was approved by Knight, who "ultimately decided" to suspend Hall. (Doc. No. 208 at 110-11, 139-41, 159; *see also* Doc. No. 207 at 35-36.) Hines forbade Hall to "make contact with anyone," but refused to provide Hall with a written notice regarding her suspension.[3] (Doc. No. 207 at 40.)

After talking with her Alabama Education Association representative, Hall went to the office of human resources and requested a written letter notifying her of her suspension because she wanted documentation that she was not abandoning her job. (*Id*.) Hall spoke with someone in the human resources department who called Hines on the telephone, "made a face," and then instructed Hall to "go home" and that "the letter [was] coming." (*Id*. at 41.) Hall left campus. After she left, she received a telephone call from someone at ASU who asked her if she had left campus, and when she confirmed that she had, the person on the other end of the phone call said, "good, because they have police over here for you." (*Id*. at 42.) Hall stated that the exchange left her "humiliated;" she testified that

---

[3] ASU has some policies in place (or did, at the time of the events pertinent to this action) regarding the suspension of faculty and staff who were accused of endangering student welfare. The employee's supervisor would recommend suspension, the university president would approve the recommendation, and the human resources department would implement the suspension by notifying the subject of the suspension in writing. (Doc. No. 208 at 39.) The writing would be delivered personally to its recipient, if that employee was present at work on campus at the time, or, if not, it would be delivered by certified mail. (*Id*.) It was not ASU's policy for "a supervisor [to] just come in and say [to the employee,] 'I'm placing you on leave' and send [the employee] home without giving them something in writing." (*Id*.) If the employee being suspended was an athletic coach who was being suspended for actions taken in their capacity as a coach, the employee would generally be allowed to continue adjunct teaching duties (if they had any), although the provost would ultimately decide whether the employee could continue teaching. (*Id*. at 40.) No policy was in place to govern whether the employee could continue to take classes at ASU, if they were enrolled in any, though they generally were allowed to continue taking their classes. (*Id*. at 40-41.)

she "c[ould]n't really describe the pain, how [she] felt crushed as a person to not be given the decency to understand what was going on." (*Id*.)

On approximately March 7, 2014, Hall received the following letter in the mail, which was dated March 4, 2014:

> The president has approved the recommendation that you be placed on administrative leave with pay pending an outcome of the investigation into alleged unsatisfactory conduct pertaining to the student welfare, effective[] immediately. Furthermore, during this time, you are not to contact any student at Alabama State University.
>
> Sincerely,
> Zillah Fluker
> Interim Vice President
> Office of Human Resources

(*Id*. at 43-44, 89.)[4]

Though the letter was not copied to ASU's president, Dr. Gwendolyn Boyd,[5] it was copied to Hall's adjunct teaching supervisor, Dr. Doris Screws. (*Id*. at 44.) Dr. Screws instructed Hall to comply with the letter, which meant not being on campus or teaching classes. (*Id*. at 48.) Hall was also unable to attend the classes[6] she was taking in the spring semester in the area of health information management. (*Id*. at 49.) She had to make

---

[4] As the Court observed at trial, when Hall's attorney asked her to read Fluker's letter, Hall became visibly emotional with tears in her eyes, and was unable to read the letter. With the Court's permission, Hall's attorney then read the letter into evidence. (Doc. No. 207 at 43-44.) The Court makes no credibility findings and notes Hall's demeanor on the stand only because the jury was entitled to consider it in assessing Hall's credibility and her claims for compensation for emotional and mental distress.

[5] On December 20, 2013, ASU's board of trustees appointed Dr. Boyd as president of the university, effective February 1, 2014. (Doc. No. 207 at 27.) Her immediate predecessor in office was Dr. William Harris. (*Id*.)

[6] Hall could not recall precisely how many classes she was taking during the 2014 spring semester, but it was "three, four, maybe five." (Doc. No. 207 at 49.)

alternate arrangements to ensure that she did not miss assignments and to be able to "do what [she needed] to do from home." (*Id*.)

Fluker's March 4, 2014 notice-of-suspension letter left Hall feeling "crushed," unable to "figure out where all this was coming from," but if she "had to put a word on the pain that [she] felt, [she] was humiliated because this was put out that this is why" she "had to leave campus." (*Id*. at 45.) Because she was not allowed on campus, she was unable to contest her suspension, and, while she was suspended, no one told her what she had been accused of doing that had allegedly endangered student welfare. (*Id*. at 46.) At some point, she was called to campus to meet with an ASU lawyer who "questioned [her] and questioned [her]" for eight hours, including questions about some documents. (*Id.* at 51-54). Hall informed the ASU lawyer that the documents were clearly inaccurate, and that she knew she had not submitted them because they showed students as players on the current ASU softball roster who were not players, but recruits still in high school. (*Id*.) At no time during the questioning did ASU's lawyer tell Hall what the allegations against her were. (*Id*. at 52.)

Hall eventually received a letter in the mail from ASU informing her that her employment was terminated. (*Id*. at 54-55.) At the time she received that letter, she still had not been informed of the exact reason for her suspension or termination, nor had she been provided an opportunity to respond to the charges. (*Id*.)

Three years after her termination, in a deposition in this case, Hall was shown emails from parents of student athletes who had complained about her, and this was when she first learned the nature of the allegations that she had endangered student welfare. (*Id*. at 56-

57.) From the emails, she learned that some athletes' parents had alleged (1) that, in some games, she had required students to wear t-shirts that had their names and numbers written on them in marker; (2) that she had not provided enough food to the student athletes; (3) that she had scheduled practices at times that made it difficult for some athletes to get to the dining hall while it was open; (4) that she had yelled and cursed at some of the players; and (5) that she had required a player to remain on the air-conditioned charter bus during a game due to the player's attitude. (*Id*. at 59-74.) In addition, there were allegations concerning a 2012 hazing incident involving seniors requiring new team members to run at night and a student athlete having to be transported to the hospital for dehydration; the incident occurred without Hall's knowledge, but within a few days after the incident occurred, she learned what had happened and addressed it with the team. (*Id*. at 71-73.) Hall denies the parents' allegations and contends that she has documentation that could have disproven the allegations or justified her actions if she had been allowed to present that information prior to the suspension, or if she had been allowed on campus during her suspension to access her files and to defend herself. (*Id.* at 60-74.)

Hall contends that, because of the way she was suspended, banned from campus, prohibited from taking and teaching classes, and not told the reason for her suspension, her professional reputation suffered, and she suffered mentally and emotionally. (*Id*. at 75.) She no longer wanted to coach. (*Id*. at 77.) Because her banishment from campus effectively prevented her from learning the specifics of the allegations against her and from defending herself against them, she "was very self-conscious going out in public" and "didn't want to be around people because [she] didn't know what the speculations were."

(*Id*. at 49-50.) Her ability to enjoy sports, her career, and her love of coaching suffered. (*Id*. at 77-78.) She had enjoyed softball since she was five, watching the softball world series with her family every year and cheering for her team, but after the incident, she did not want to watch softball anymore or coach. (*Id*.) In fact, she "didn't want to participate in anything that related to sports for a while just because it trigger[ed] so much of anxiety and depression with [her] because during that time, [she] went through a dark moment." (*Id.* at 78.) She testified that the suspension caused her to struggle with anxiety and depression:

> Competing under pressure has never been an issue for me. Pressure – handling pressure, being in stressful situations had never been an issue for me. Matter of fact, I always competed. I was that – what you would consider that clutch player. I was that player that you could put me up to bat with three balls, two strikes, bases loaded, and you need a hit. I thrive for that type of environment.
>
> But after this, it took a toll because you took away my ability to stand up for myself. You took away the right for me to even fix or somewhat decide what would be my next move within this as a professional. You took away the opportunity for me to clear my name. And when you walk around and you don't know there is – you don't know what people are talking, it has a lot. And so I would say during that time, I went through a very dark moment.

(*Id*. at 78.)

Throughout her testimony, Hall was at times emotional, sad, anguished, or holding back tears. Hall testified in response to questioning by her own attorney and by defense counsel that a condition involving her thyroid was complicated by the stress, anxiety, and depression she was undergoing as a result of the manner of her suspension. (*Id*. at 78-79; Doc. No. 208 at 21.) Hall spoke of her struggles to deal with her anxiety and depression after her suspension so that she could "still be a mom and be present for [her] child," including taking medication for anxiety and depression and avoiding talking to people

(including family) if she felt like the conversation would trigger her feelings of anxiety and depression about the manner of her suspension. (Doc. No. 207 at 79.) She also testified that, in consultation with her physician, she had to stop taking depression medication due to side effects, and so she sought other ways to deal with her depression, such as therapy. (Doc. No. 208 at 21.) When asked how she felt about what ASU did to her, she replied,

> I guess the only way – I can't really put it into words, but I would tell you that I was a – I was definitely a Hornet. My Christmas was old gold and black. I had all kind of black and old gold ornaments. My living room was old gold and black. After this, you can definitely bet that didn't happen anymore. And I – it ain't my ASU anymore. That's the best way I can say it. It's definitely not my ASU anymore.

(Doc. No. 207 at 80.)

Dr. Boyd testified that, in her capacity as president, she received recommendations from employees' supervisors regarding suspensions and then made a decision whether to approve the recommendation to suspend those employees without micromanaging the supervisors. (Doc. No. 208 at 48-49.) She could not remember ever overriding a supervisor's recommendation of suspension. (*Id*. at 49.) Dr. Boyd testified that Hines made the suspension recommendation for the athletic department via a memo sent through Knight. (*Id*. at 54, 57-58.) Dr. Boyd also testified that, when she approved the recommendation to suspend Hall, she had already independently received additional information concerning complaints about Hall, *e.g.*, an email from a parent who had complained, a letter from a parent who had complained, and verbal statements from students who had claimed that softball students were running barefoot in Patterson Court, a low-income housing complex in Montgomery, Alabama. (*Id*. at 63-97.) However, in

9

response to Hall's attorney's extensive questions, Dr. Boyd's recollection shifted and her testimony that she received the additional information prior to approving Hines's recommendation could have been seen by a reasonable juror as internally inconsistent and incongruent with the timeline of events that had been established by other evidence. (*Id*.)

B.     Melendez's Suspension

In June or July of 2011, ASU hired Mervyl S. Melendez, a male, as head baseball coach. (Doc. No. 207 at 27.) Neither the baseball team nor the softball team were revenue-generating sports. (*Id*. at 100.) In 2012, Lloyd Austin Kelly, a student athlete on the baseball team, accused Melendez of discriminating against the non-Hispanic players on the baseball team and of encouraging the baseball players to use performance-enhancing drugs. (Doc. No. 208 at 146, 170-71.) There were also issues with Melendez cursing at students and retaliating against a student who had a class that conflicted with practice time. (*Id*. at 168-69.) Kelly complained about these issues to the athletic department. (*Id*. at 166.). He sent his complaint by certified mail to Knight and Stacey Danley, who was the athletic director at that time. (*Id*. at 153, 171.) Knight authored a written response to the allegations against Melendez, which included a statement that an investigation would ensue. (*Id*. at 152.)

However, Melendez was not suspended, though ASU would have considered encouraging students to use performance-enhancing drugs to be an act endangering student welfare. (*Id*. at 125.) The day after Knight and Danley received Kelly's certified letter, Melendez called Kelly into his office, cursed at him, threatened him, and suspended him from the team indefinitely until his complaint had been investigated. (*Id*. at 172-73.) Kelly subsequently met with Danley and Hines, who at that time was Senior Associate Athletic

Director. (*Id*. at 124, 173.) Danley and Hines "kind of laughed it off and swept it under the rug" and "told [Kelly] to stay off the team until they concluded the investigation." (*Id*. at 174.) Kelly remained suspended from the team for the entire season, which was his senior season, so he never returned to the baseball team. (*Id*. at 169, 174.)

### III.    PROCEDURAL HISTORY

A.    The Complaint

On June 19, 2016, Hall filed a Complaint against ASU alleging multiple grounds of gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. (*See* Doc. No. 1.) Of the claims raised in the Complaint, the one destined to survive until trial was Hall's claim that, in violation of Title VII, ASU discriminated against her by treating her differently than similarly situated male employees when it suspended her with pay and banned her from campus after receiving parent complaints about her treatment of athletes on the softball team. According to the Complaint, the suspension with banishment from campus prevented her from attending classes in which she was enrolled and prevented her from teaching classes she had been scheduled to teach. (Doc. No. 1 at ¶¶ 39, 51-61.) Hall contended that, in the face of materially similar allegations against them, other male coaches were not suspended in a manner that prevented them from being present on campus, answering the charges against them, or interacting with students pending ASU's investigation.

B.    Motion for Summary Judgment

On October 23, 2017, ASU filed a motion for summary judgment (Doc. No. 20), which was successful as to all of Hall's claims but her claim for gender discrimination

regarding her suspension. The suspension with banishment from campus allegedly prevented her from participating in the investigation, accessing her files, teaching courses she had been hired to teach (which allegedly resulted in nonrenewal of her adjunct teaching contract), and attending graduate level courses in which she was enrolled (which allegedly deprived her of her employment benefit of tuition-free classes). (Doc. No. 59 at 9-10.)

In a Memorandum Opinion and Order entered January 8, 2019, the Court[7] considered and rejected ASU's argument that Hall's suspension with pay was not an adverse employment action within the meaning of Title VII, concluding as follows:

> Viewing all of the actions ASU took in suspending Hall—including suspending her from coaching for over a month; barring her from contact with all students, which prevented her from teaching classes and stopped her from taking her own classes; and preventing her from having access to her files—the court concludes this is not a case, like those in other circuits, in which there was a suspension with pay "without more." *See, e.g., Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) ("[A]dministrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action."). Instead, taken together, the circumstances of Hall's suspension constituted a serious and material change in the terms, conditions, or privileges of her employment.

> Additionally, this is not a situation in which Hall was restored to her position at the end of the suspension…. Instead, she was terminated and one of the reasons offered for her termination was the fact that allegations were pending against her… As noted, Hall has presented evidence that her removal from campus prevent[ed] her from accessing files which could have helped her to answer the allegations.

(Doc. No. 59 at 11-12.)

---

[7] United States Magistrate Judge Gray M. Borden entered the January 8, 2019 Memorandum Opinion and Order ruling on the then-pending motion for summary judgment.

The Court also rejected ASU's assertion that, under Eleventh Circuit case law, Melendez[8] was not an appropriate comparator[9] to Hall because Dr. William Harris was ASU's president at the commencement of the Melendez investigation and Dr. Boyd was in that role when the allegations against Hall were made. (Doc. No. 59 at 15.) Specifically, the Court concluded as follows regarding the validity of using Melendez as a comparator:

> The court begins with Melendez, the head baseball coach. A baseball parent alleged "numerous violations of NCAA regulations and federal and state law by Melendez and the baseball program (including, but not limited to, the use of performance enhancing drugs by baseball student-athletes and discrimination against non-Hispanic baseball student athletes)." Doc. 26-24 at 28.
>
> ASU argues that Hall's and Melendez's situations are distinct because the Melendez investigation did not involve a student welfare issue. In her deposition, however, Boyd, the President who approved Hall's suspension, was specifically asked to compare Hall's situation to the hypothetical situation of a baseball coach being accused of asking students to take performance enhancing-drugs, or steroids, and whether that accusation would be enough to suspend a coach pending an investigation. Doc. 20-8 at 120:18–23. Boyd answered, "[p]ending an investigation, absolutely, because that's an NCAA violation." Doc. 20-8 at 120:24–25. When asked about such a complaint being made by a baseball player's father, Boyd answered that the "same action would have been taken as we did with Ms. Hall, immediately remove them from the students by placing them on administrative leave, investigate to find out if it's true, and then take the appropriate action." Doc. 20-8 at 120:24–25 & 121:8–12. Boyd's testimony, therefore, supports a conclusion that the same ASU policy applied to, and was violated by, Melendez and Hall. Drawing all reasonable inferences in favor of the non-movant, a reasonable jury could conclude that Boyd's testimony equates the two employees and makes them sufficient

---

[8] The Court considered and rejected Hall's contention that other coaches were acceptable comparators. (Doc. No. 59 at 16-17.)

[9] A plaintiff alleging disparate treatment "'must show either (a) that [s]he did not violate the work rule, or (b) that [s]he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against h[er] were more severe than those enforced against the other persons who engaged in similar misconduct.' *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989)." (Doc. No. 59 at 13.)

comparators. In other words, the testimony of Boyd would allow a reasonable jury to conclude that the two employees could be viewed as engaging in the same infraction with a different reaction from ASU.

ASU notes that at the commencement of the Melendez investigation, Dr. William Harris was the President of ASU and Stacy Danley was the Athletic Director. ASU argues that the different decisionmakers are significant because, under Eleventh Circuit law, "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination" because "different supervisors may employ different disciplinary measures." *Silvera v. Orange Cnty. Sch. Bd*., 244 F.3d 1253, 1261 n.5 (11th Cir. 2001). The Eleventh Circuit also has clarified, however, that the presence of two different supervisors is not determinative. *See Anderson v. WBMG-42*, 253 F.3d 561, 566 (11th Cir. 2001) (stating that cited authorities do not stand for the proposition that whenever two different supervisors are involved in administering the disciplinary actions, the comparators cannot as a matter of law be similarly situated for Title VII purposes). Although Harris was the President at the commencement of the investigation of Melendez, the evidence before the court is that a report was submitted to the NCAA on Melendez in September 2013 and that an additional report was made in February 2015. Doc. 26-24. Boyd became president in February 2014, which was before the end of Melendez's investigation. The President approved actions of the Athletic Directors. The court cannot conclude, therefore, as a matter of law that the difference in presidents is dispositive. *Cf. Rioux v. City of Atlanta, Ga*., 520 F.3d 1269, 1281 (11th Cir. 2008) (stating that "even as Appellees contend that Rubin was not directly involved in the investigation of Dunham, they concede it was necessary for him to approve the ultimate sanction imposed").

The court is mindful that comparators accused of a violation of a rule must be nearly identical. *Wilson [v. B/E Aerospace, Inc*.,] 376 F.3d [1079,] 1091 [(11th Cir. 2004)]. In this case, Boyd, the President of ASU who approved the suspension of Hall and who became President before the end of the investigation of Melendez, testified in her deposition when given a hypothetical question consistent with the evidence concerning a complaint against baseball head coach Melendez, that the offender in the hypothetical should have been suspended as Hall was. The court concludes, therefore, that Hall has established a *prima facie* case of disparate treatment in suspension based on Melendez as a comparator.

(Doc. No. 59 at 14-16.)

C.    Motion for Reconsideration

On October 24, 2021, with leave of court to do so, ASU filed a Motion to Reconsider the Court's January 8, 2019 Memorandum Opinion and Order. (Doc. No. 128.) In that motion, ASU argued that reconsideration of summary judgment was warranted by Eleventh Circuit decisions issued after January 8, 2019. ASU argued that, under the new precedent, Melendez was not an appropriate comparator for the purpose of proving a *prima facie* case of disparate treatment because he was not situated sufficiently similarly to Hall. Specifically, ASU pointed out that Dr. William Harris was ASU's president at the time of Kelly's accusations against Melendez, whereas Hall was suspended early in Dr. Boyd's presidency, whom ASU alleged[10] was unaware of Melendez's misconduct at the time she approved Hines's (and Knight's) recommendation to suspend Hall without pay. (Doc. No. 128.)

In a Memorandum Opinion and Order entered June 17, 2022, the Court rejected ASU's argument that it was entitled to reconsideration of its summary judgment motion on

---

[10] In her deposition, Dr. Boyd was asked, "[D]o you know whether any such complaint like that [i.e., a complaint of a coach asking a player to take performance enhancing drugs, which was what Melendez was accused of doing] was received by ASU against--?" In response, Dr. Boyd stated, "Not to me." (Doc. No. 128 at 9 (quoting Doc. No. 20-8 at 31-32.)) In its Motion for Reconsideration, ASU seized upon this testimony as dispositive proof that, at the time of Hall's suspension, Dr. Boyd was unaware of the complaints about Coach Melendez prior to her tenure as president. Competing inferences could be drawn from Dr. Boyd's response, and reasonable competing factual inferences were not to be resolved in ASU's favor on summary judgment. The deposition testimony upon which ASU based its Motion for Reconsideration is not an unequivocal statement of whether Dr. Boyd *knew* about any such complaint ever having been made to ASU, only a statement that a complaint of that sort had not been made *to her*. Dr. Boyd also testified that, if such a complaint had been made to ASU regarding a coach pressuring athletes to take performance enhancing drugs, then "[t]he same action would have been taken as we did with Ms. Hall – immediately remove them from the students by placing them on administrative leave, investigate and find out if it's true, and then take the appropriate action." (Doc. No. 20-8 at 32.)

grounds that Melendez and Hall did not have the same supervisor. (Doc. No. 138.) The Court concluded that, even under the new precedent, having the same supervisor was not necessarily a legal requirement in every case, and the rationale of the January 8, 2019 Memorandum Opinion and Order was still valid. (Doc. No. 138 at 6-7.) Finding no manifest error in law and no material change in controlling law on the issue (*id*. at 7), the Court explained:

> In arguing that the summary judgment ruling was erroneous, ASU cites *Lewis v. City of Union City, Ga*., 918 F.3d 1213 (11th Cir. 2019) (en banc) to show that Melendez cannot serve as a comparator to Hall. *Lewis* clarified the standard for how courts in this Circuit should assess comparators, holding that "a plaintiff proceeding under *McDonnell Douglas* must show that she and her comparators are 'similarly situated in all material respects.' " *Lewis*, 918 F.3d 1226. After emphasizing that evaluation of the "all material respects" standard "will have to be worked out on a case-by-case basis," the Circuit provided examples of "the sorts of similarities that will, *in the main*, underlie a valid comparison." *Id*. at 1227 (emphasis added). The *Lewis* factor argued by ASU is that "a similarly situated comparator will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff." *Id*. (citing *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (observing that "disciplinary measure undertaken by different supervisors may not be comparable for purposes of Title VII analysis")). ASU also directs the Court to *Hester v. Univ. of Ala. Birmingham Hosp*., 798 F. App'x 453 (11th Cir. 2020), for its "same supervisor" argument, reasoning that the succession of ASU presidents precludes comparison between Hall and Melendez because "[a]t the time of the complaint against Melendez in 2012, Dr. William Harris was ASU's Interim President" and Boyd "was not involved in determining what, if any actions, to be taken against Melendez in 2012." (Doc. No. 128 at 5.)
>
> Hall argues that regardless of which ASU president presided over the investigations, the same ASU officials were responsible for the recommendations to suspend Hall and not suspend Melendez. (Doc. No. 129 at 9-10.)
>
> The Court rejects ASU's argument that *Lewis* and *Hester* stand for the proposition that as a matter of law comparators must be supervised by the same individual or the same decision maker must administer the disciplinary

action in order to establish disparate treatment under Title VII. ASU overlooks the qualifiers used by the Eleventh Circuit in *Lewis* and *Hester*. In *Lewis*, the Circuit cautioned that the factors to be compared would indicate valid comparators "in the main" and that potential comparators would "not invariably" have the same supervisor. *Lewis*, 918 F.3d at 1227. In *Hester*, the Circuit noted that its comparator criteria are applied "generally." *Hester*, 798 F. App'x at 457. Hence, the qualifying language employed by the Eleventh Circuit and directions that comparators be evaluated on a case-by-case basis contradict ASU's argument.

Further, the Court directly addressed the "same supervisor" issue in its summary judgment ruling and found that because Boyd's presidency straddled the Melendez and Hall investigations, the different treatment of the two under the same employment policy supports the determination that Melendez is a proper comparator. (Doc. No. 59 at 16.) Because the record shows that the Court fully considered ASU's "different supervisor" argument and ASU has not shown any manifest error in law or change in controlling law on this issue, the Court finds no error. *See Hughes v. Stryker Sales Corp*., Civil Action No. 08-0655-WS-N, 2010 WL 2608957, at *3 (S.D. Ala. June 28, 2010) (a motion to reconsider is not a "vehicle for rehashing arguments considered and rejected") (citing *Gipson v. Mattox*, 511 F. Supp. [2d] 1182, 1185 (S.D. Ala. 2007)).

(Doc. No. 138 at 8-9.)

The Court also rejected ASU's argument that it was entitled to reconsideration of its summary judgment motion on grounds that Dr. Boyd allegedly did not have knowledge of Melendez's alleged infraction when Hall was suspended. (*Id*. at 8-9.) The Court explained:

ASU next argues that Boyd did not have knowledge of Melendez's alleged infraction when Hall was suspended. (Doc. No. 128 at 8.) ASU asserts that under *Jones v. Gerwens* and a recent decision from this district, *Rousseau v. Ala. Cmty. Coll. Sys*., No. 2:20-cv-391-RAH-SMD, 2021 WL 3476605 (M.D. Ala. Aug. 6, 2021), a plaintiff fails to establish a *prima facie* case if she cannot show that her employer was aware of the comparator employee's misconduct. (Doc. No. 128 at 7 (citing *Rousseau*, 2021 WL 3476605 at *5).) In making this argument, ASU presents the same testimony cited in the Court's decision that a jury should consider whether ASU improperly suspended a female coach for possibly mistreating student athletes when it

17

took no action against a male coach facing similar complaints. (Doc. No. 128 at 9.)

Hall responds that even after Boyd learned of the Melendez complaint, ASU took no action against him. (Doc. No. 129 at 8, 11.) Further, she asks the Court to recognize that because the same ASU officials determined the response to both complaints and recommended that Boyd suspend Hall, it is appropriate to find comparator status. (*Id*. at 9-10.)

"By its very nature . . . discrimination is a comparative concept – it requires an assessment of whether 'like' (or instead different) people or things are being treated 'differently.' " *Barber v. Cellco P'ship*, 808 F. App'x 929, 936 (11th Cir. 2020) (quoting *Lewis*, 918 F.3d at 1223). The record before the Court establishes that, albeit the identity of the person who fulfilled the role of ASU president and was the ultimate decision maker as to the discipline imposed changed during the relevant period, the ASU officials who made the recommendation for the discipline remained the same. (Doc. No. 26-5 at 65:254; 66:256-57; 84:331.) Accordingly, Hall has raised an inference that she and Melendez were subjected to different treatment under the same employment policy by the same group of officials, therefore the summary judgment ruling in this case will stand. *See Lathem v. Dep't of Children & Youth Servs*., 172 F.3d 786, 793 (11th Cir. 1999) (stating that the relevant inquiry for discriminatory intent is whether comparators were "subjected to different employment policies" by their employer). ASU has not shown any manifest error in law.

(Doc. No. 138 at 8-9.)

In the order on ASU's Motion to Reconsider, the Court also addressed the following

issue:

On April 25, 2022, ASU entered a Notice of Filing (Doc. No. 136) which apprised the Court of a recent Eleventh Circuit decision addressing "[w]hether suspension with pay can rise to the level of an adverse employment action in discrimination cases," an issue of first impression in this Circuit. *Davis v. Legal Svcs. Ala., Inc*., 19 F.4th 1261, 1266 (2021). ASU reminds the Court that it argued in its Brief in Support of Summary Judgment that Hall's suspension was not an adverse employment action. (Doc. No. 136 at ¶ 2; Doc. No. 20 at 65.) Although ASU did not move to amend its motion to reconsider, it now urges the Court to find that Hall's paid suspension was not an adverse employment action, that she has not made a *prima facie* case, and summary judgment should be entered in its favor. (Doc. No. 136 at ¶ 3.)

In *Davis*, the Eleventh Circuit noted that no Circuit has held that "a simple paid suspension, in and of itself, constitutes an adverse employment action." *Davis*, 19 F.4th at 1266. The Circuit then stated, "[w]e agree with our sister Circuits that a simple paid suspension is not an adverse employment action." *Id.* at 1267. "A paid suspension can be a useful tool for an employer to hit 'pause' and investigate when an employer has been accused of wrongdoing. . . . Employers should be able to utilize the paid-suspension tool in good faith, when necessary, without fear of Title VII liability." *Id.* However, the Circuit's analysis did not end there. The Circuit proceeded to consider the factual circumstances surrounding Davis's paid suspension and concluded that the circumstances did not rise to the level of an adverse employment action. *Id.*

This Court's ruling is not in conflict with *Davis*. After surveying the range of decisions within this Circuit, the Court looked at "all of the actions ASU took in suspending Hall – including suspending her from coaching for over a month; barring her from contact with all students . . . prevent[ing] her from teaching classes and stopp[ing] her from taking her own classes; and preventing her from having access to her files" and concluded that "this is not a case, like those in other circuits, in which there was a suspension with pay 'without more.' " (Doc. No. 59 at 11-12 (quoting *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006)).[11] ASU does not address these "without more" circumstances. (*See* Docs. No. 134, 136.) Because the Court fully discussed how Hall's suspension was not a simple paid suspension in its summary judgment ruling and ASU does not challenge the Court's "without more" analysis, the Court finds no manifest error in law.

(Doc. No. 138 at 9-11.)

Thus, the Court concluded that Melendez was a proper comparator and that Hall met the *prima facie* elements of a gender discrimination claim, and the Court denied ASU's Motion for Reconsideration. (*Id.* (Doc. No. 138.)

---

[11] "This Court's ruling is not inconsistent with *Davis* but was actually prescient on the approach later taken by the Eleventh Circuit. *Joseph v. Leavitt* was the lead case cited in *Davis* to distinguish those cases and circumstances where a paid suspension may constitute an adverse employment action. *See Davis*, 19 F.4th at 1266." (Doc. No. 138 at 10 n.5.)

D.      Dispositive Trial and Postjudgment Motions

At the close of Hall's case, ASU moved for judgment as a matter of law on grounds that (1) "difference in treatment by different supervisors or decision-makers can seldom be the basis for a viable claim of discrimination;" (2) Hall "did not suffer an adverse employment action;" (3) there was no evidence that, at the time of Hall's suspension, Dr. Boyd knew about the allegations against Melendez; and (4) ASU had a legitimate, nondiscriminatory reason to place Hall on suspension (specifically, that there were allegations of impropriety ASU wished to investigate). (Doc. No. 208 at 189-92.) At the close of all the evidence, ASU renewed its motion for judgment as a matter of law based on "the same arguments." (Doc. No. 208 at 215.)

The jury found in favor of Hall and awarded her $800,000.00 in damages. (Doc. No. 188.)

On December 15, 2022, ASU moved for judgement notwithstanding the verdict, arguing that the verdict was excessive in light of 42 U.S.C. § 1981a(3), which limits employer liability for damages in Title VII actions to not more than $300,000.00 when the employer employs more than 500 employees for a specified time period within the current or preceding calendar year. (Doc. No. 189). On December 19, 2022, the Court denied the motion as premature without prejudice to refile the motion after entry of judgment. (Doc. No. 193.)

On December 19, 2022, the Court entered a Final Judgment

that Plaintiff shall recover from Defendant the sum of $800,000.00, plus post-judgment interest at the rate prescribed by 28 U.S.C. § 1961. It is further

ORDERED that costs are TAXED against Defendant, for which let execution issue.

(Doc. No. 194.)

On January 13, 2023, Hall filed her Motion to Amend the Final Judgment to include an award of attorneys' fees and injunctive relief. (Doc. No. 198.)

On January 13, 2023, ASU filed its Motion for Judgment Notwithstanding the Verdict, or, in the Alternative, Motion for a New Trial. (Doc. No. 199.) ASU argues (1) Hall failed to establish that she suffered an adverse employment action; (2) the verdict was flawed as a matter of law and against the great weight of the evidence because Hall did not present any evidence of intentional discrimination; (3) Melendez was not a proper comparator because he was not supervised by the same decision maker (Dr. Boyd) who suspended Hall's employment and banned her from campus pending the outcome of the investigation, and because Dr. Boyd allegedly did not have actual knowledge of the allegations against Melendez when she suspended Hall and banned her from campus; (4) ASU had a legitimate, nondiscriminatory reason for suspending Hall's employment; (5) the court erred by including a cat's paw instruction to the jury; (6) the amount of damages awarded Hall exceeded the damages allowable under § 1981a(3); and (7) the amount of damages awarded was excessive as a matter of law and against the great weight of the evidence.

Hall's Motion to Amend the Final Judgment (Doc. No. 198) and ASU's Motion for Judgment Notwithstanding the Verdict, or, in the Alternative, Motion for a New Trial (Doc. No. 199) are fully briefed and are ripe for disposition.

21

## IV.    STANDARDS OF REVIEW

A.    Motion to Amend the Judgment

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, a party may file a motion to alter or amend a judgment within twenty-eight days of the entry of judgment. "The decision to alter or amend judgment is committed to the sound discretion of the [trial] judge." *Am. Home Assur. Co. v. Glenn Estess & Assocs., Inc*., 763 F.2d 1237, 1238-39 (11th Cir. 1985).

Rule 59(e) does not itself provide a standard to guide the court's consideration of a motion to alter or amend the judgment. However, "'The only grounds for granting [a Rule 59(e)] motion are newly-discovered evidence or manifest errors of law or fact.'" *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (quoting *In re Kellogg*, 197 F.3d 1116, 1119 (11th Cir. 1999)). *See also* 11 CHARLES ALLEN WRIGHT & ARTHUR R. MILLER, 11 FEDERAL PRACTICE AND PROCEDURE § 2810.1 (3d ed. 2023) ("[R]econsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly."). The four basic grounds for granting a Rule 59(e) motion are "(1) manifest errors of law or fact upon which the judgment was based; (2) newly discovered or previously unavailable evidence; (3) manifest injustice in the judgment; and (4) an intervening change in the controlling law." *Taylor v. First N. Am. Nat. Bank*, 331 F. Supp. 2d 1354, 1355 (M.D. Ala. 2004) (citing WRIGHT & MILLER, 11 FEDERAL PRACTICE AND PROCEDURE § 2810.1).

There are some things for which a Rule 59(e) motion cannot be used. A party "cannot use a Rule 59(e) motion to relitigate old matters [or] raise argument[s] or present evidence that could have been raised prior to the entry of judgment." *Michael Linet, Inc. v.*

*Vill. of Wellington, Fla*., 408 F.3d 757, 763 (11th Cir. 2005). Matters collateral to or wholly separate from the judgment, such as a motion for attorneys'[12] fees and costs that are not specifically addressed in the judgment, are generally outside the scope of a Rule 59(e) motion. WRIGHT & MILLER, 11 FEDERAL PRACTICE AND PROCEDURE § 2810.1; *see also F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 373 n.10 (1984) ("As we recognized in *White v. New Hampshire Dept. of Employment Security*, 455 U.S. 445[, 452] (1982), an 'award [of attorneys' fees] is uniquely separable from the cause of action' that is settled by a court's judgment on the merits, and therefore a post-judgment request for attorney's fees is not considered a motion to amend or alter the judgment under Rule 59(e) of the Federal Rules of Civil Procedure."). Finally, "[a] judgment will not be amended or altered if to do so would serve no useful purpose." *Taylor*, 331 F. Supp. 2d at 1355.

**B.     Renewed Motion for Judgment as a Matter of Law[13]**

---

[12] *See Estate of Terry Gentry v. Hamilton-Ryker IT Sols., LLC*, Case No. 3:19-cv-320, 2023 WL 5018432, at *1 n.2 (S.D. Tex. Aug. 7, 2023), *report and recommendation adopted*, No. 3:19-CV-00320, 2023 WL 5489046 (S.D. Tex. Aug. 24, 2023) (discussing at length how to properly manage apostrophes and plurals when referring to the fees to be awarded attorneys, and settling on the following reasonable solution: "I will use 'attorney's fees' to refer to fees sought by one lawyer and 'attorneys' fees' to refer to fees sought by more than one lawyer. I will eschew entirely 'attorney fees' and 'attorneys fees.' Now, back to the show.").

[13] ASU styled its motion as a "Renewed Motion for Judgment Notwithstanding the Verdict, or In the Alternative, Motion for New Trial." (Doc. No. 199.) However, a 1991 amendment to Rule 50(b) recharacterized a motion for judgment notwithstanding the verdict as simply "another form of a motion for judgment as a matter of law." WRIGHT & MILLER, 9B Fed. Prac. & Proc. Civ. § 2537 (3d ed 2023). "No change in the substance of the motion was intended by the 1991 amendment, however." *Id*. Despite the amendment, the terms "renewed motion for judgment as a matter of law" and "motion for judgment notwithstanding the verdict" are still commonly used interchangeably. *See, e.g.*, *Grimes v. Rott*, No. 20-10498, 2021 WL 4427748, at *2 (11th Cir. Sept. 27, 2021) (referring to a motion filed pursuant to Rule 50(b) as "[a] motion for judgment notwithstanding the verdict").

Rule 50(a) of the Federal Rules of Civil Procedure provides that a court may enter judgment as a matter of law against a party on an issue, claim, or defense "[i]f [that] party has been fully heard on [that] issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2).

"If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Within 28 days after the entry of judgment,[14] "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). As with a motion for judgment as a matter of law made pursuant to Rule 50(a), a Rule 50(b) motion for judgment as a matter of law "should be granted only if, in viewing all the evidence and construing all inferences in the light most favorable to the nonmoving party, the court finds no reasonable juror could have reached the verdict returned." *Grimes v. Rott*, No. 20-10498, 2021 WL 4427748, at *2 (11th Cir. Sept. 27, 2021) (citing *Ortega v. Schramm*, 922 F.2d 684, 694–95 (11th Cir. 1991)). Put another way, the court must determine if the evidence was legally sufficient for the jury to find for

---

[14] If the post-verdict motion for judgment as a matter of law addresses a jury issue that was not decided by the jury's verdict, the motion must be filed "no later than 28 days after the jury was discharged." Fed. R. Civ. P. 59(b).

a party on the issue in question, *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016), "whether such sufficient conflicts exist in the evidence to necessitate submitting the matter to the jury[,] or whether the evidence is so weighted in favor of one side that one party must prevail as a matter of law." *Thosteson v. United States*, 331 F.3d 1294, 1298 (11th Cir. 2003).

C.      Motion for New Trial

Rule 59(a)-(b) of the Federal Rules of Civil Procedure provides that, within 28 days after entry of the judgment, any party may move for a new trial on some or all issues on grounds "that 'the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair . . . and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.'" *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).

"'Although a trial judge cannot weigh the evidence when confronted with a motion [for judgment] notwithstanding the verdict, in a motion for a new trial the judge is free to weigh the evidence.'" *Id*. (quoting *Rabun v. Kimberly–Clark Corp*., 678 F.2d 1053, 1060 (11th Cir. 1982)). "[W]hen independently weighing the evidence, the trial court is to view not only that evidence favoring the jury verdict but evidence in favor of the moving party as well." *Id*. (quoting *Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982). Before a new trial may be granted on grounds that the verdict is against the weight of the evidence, "the verdict must be found contrary to 'the great, and not merely the greater

weight of the evidence.'" *Rabun*, 678 F.2d at 1060 (quoting *King v. Exxon Co., U.S.A*., 618 F.2d 1111, 1116 (5th Cir. 1980)). "'If the facts and inferences point overwhemingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion [is] properly granted.'" *Tidwell v. Carter Prods*., 135 F.3d 1422, 1425 (11th Cir. 1998) (quoting *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989)). However, "if there is substantial evidence … such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then [the] motion [is] due to be denied." *Id*. (quoting *Carter*, 870 F.2d at 581).

In considering whether the verdict is against the great weight of the evidence, a judge may not substitute her own inferences and credibility choices for the jury's reasonable inferences and credibility choices. *Redd v. City of Phenix City, Ala*., 934 F.2d 1211, 1215 (11th Cir. 1991). "All evidence and inferences are considered in a light most favorable to the nonmoving party," and the judge "must determine whether reasonable jurors could have concluded as this jury did based on the presented evidence." *Tidwell*, 135 at 1425. "When there is some support for [the] jury's verdict, it is irrelevant what … the … judge would have concluded." *Id*. "This comports with the longstanding principle that '[c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.'" *AM Grand Ct. Lakes LLC v. Rockhill Ins. Co*., No. 18-23576-CIV, 2022 WL 4226400, at *2 (S.D. Fla. Apr. 4, 2022), *aff'd*, 68 F.4th 1354 (11th Cir. 2023) (quoting *Narcisse v. Ill. Cent. Gulf R.R. Co*., 620 F.2d 544, 548 (5th Cir. 1980)).

# V.   DISCUSSION

A.   Hall's Motion to Amend the Final Judgment (Doc. No. 198)

1.   Attorneys' Fees

Hall moves to amend the judgment to include an award of attorneys' fees. Rule 54(d) of the Federal Rules of Civil Procedure sets out the time limit and appropriate procedure for seeking attorneys' fees, including in Title VII cases.[15] *Gryder v. Sec'y, U.S. Dep't of Transp.*, 545 F. App'x 910, 913 (11th Cir. 2013); *Webb v. City of Venice*, No. 8:19-CV-3045-TPB-TGW, 2023 WL 5051879, at *6 (M.D. Fla. Mar. 24, 2023), *report and recommendation adopted as modified on other grounds*, No. 8:19-CV-3045-TPB-TGW, 2023 WL 4418446 (M.D. Fla. July 10, 2023). Under Rule 54(d), "[a] claim for attorney[s'] fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2)(A) "Unless a statute or court order[16] provides otherwise, the motion must … be filed no later than [fourteen] days after the entry of judgment." Fed. R. Civ. P. 54(d)(2)(B)(i); *see also Gryder*, 545 F. App'x at 913 (holding that the plaintiff's failure to meet Rule 54(d)'s fourteen-day time limit defeated his motion to recover attorney's fees in his Title VII case). The motion must also "specify the judgment and the statute, rule, or

---

[15] "Title VII permits the district court, 'in its discretion, [to] allow the prevailing party ... a reasonable attorney's fee.' 42 U.S.C. § 2000e–5(k)." *Gryder v. Sec'y, U.S. Dep't of Transp.*, 545 F. App'x 910, 913 (11th Cir. 2013).

[16] The United States District Court for the Middle District of Alabama does not have a local rule modifying the time allowed for filing a motion for attorneys' fees.

other grounds entitling the movant to the award" and "state the amount sought or provide a fair estimate of it." Fed. R. Civ. P. 54(d)(2)(B)(ii)-(iii).

Hall did not file a motion for attorneys' fees within fourteen days of entry of judgment. Further, where a final judgment does not address attorneys' fees, a motion to amend the judgment is not the appropriate vehicle for seeking those fees. 11 FEDERAL PRACTICE AND PROCEDURE § 2810.1; *see also League of Women Voters*, 468 U.S. at 373 n.10. Accordingly, at this time, there exists no basis for amending the judgment to include an award of attorneys' fees.

In response to Hall's Motion to Amend the Judgment, ASU concedes that Hall is entitled to reasonable attorneys' fees and merely requests that the court provide it an opportunity to challenge the reasonableness of any requested attorneys' fees. (Doc. No. 203 at 4.) Because ASU does not oppose Hall's attempt to recoup attorneys' fees on grounds that it is procedurally improper or untimely, and because ASU concedes that Hall is entitled to reasonable attorneys' fees, the court sees no reason why Hall should not be allowed to file a proper, supported motion for attorneys' fees within fourteen days of the entry of this Memorandum Opinion and Order. At that time, ASU will be allowed to respond to the motion on any proper basis, including any justifiable argument as to the reasonableness of the fees requested. After all, in this Circuit, a timely postjudgment motion suspends the running of the deadline for filing a motion for attorneys' fees until entry of the order disposing of the postjudgment motion.[17] *Members First Fed. Credit*

---

[17] ASU does not argue that Hall may not seek attorneys' fees at this time on grounds that ASU filed its postjudgment motion after the expiration of the fourteen-day period for moving for

*Union v. Members First Credit Union of Fla.*, 244 F.3d 806, 807 (11th Cir. 2001). Moreover, "[a] new period for filing [a motion for attorneys' fees] will automatically begin if a new judgment is entered following … the granting of a motion under Rule 59." Fed. R. Civ. P. 54 (Advisory Committee's Note to the 1993 Amendment).

At this time, though, for the reasons stated above, Hall's Motion to Amend the Final Judgment is due to be denied insofar as Hall seeks to have the judgment amended to include an award of attorneys' fees.

2.      Other Taxable Costs

Hall includes in her motion a statement that the Court did not award her "attorneys' fees [and] other taxable costs." (Doc. No. 198 at 2.) The Final Judgment taxed costs against ASU, Hall submitted a bill of costs, ASU did not oppose Hall's bill of costs, and the Clerk of the Court taxed costs against ASU in the full amount of Hall's bill. (Docs. No. 194, 196, 197.) Other than attorneys' fees, Hall does not specify any costs to which she feels she is entitled, but did not receive. Accordingly, as to Hall's request to amend the judgment to include nonspecific "other taxable costs," the motion is due to be denied for failure to comply with Rule 7(b) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 7(b) ("A request for a court order must be made by motion. The motion must: … state with particularity the grounds for seeking the order … and … state the relief sought."); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a

---

attorneys' fees. Because ASU concedes that Hall may seek reasonable attorneys' fees, that argument will not be considered here. *But see Webb*, 2023 WL 5051879, at *6 (considering and rejecting the same argument); *Barber v. Hood*, No. 2:15-CV-00997-JHE, 2019 WL 3997069, at *9 (N.D. Ala. Aug. 23, 2019) (same).

possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Alternatively, the motion for unspecified "other taxable costs" is due to be denied for Hall's failure to comply with the timing and other requirements of Rule 54(d)(1).

    3.    Injunctive Relief

    In her Motion to Amend the Judgment, Hall seeks an order enjoining ASU from "alleg[ing] that [Hall] had 'inappropriate interactions with students' when the evidence presented at trial clearly showed that statement was false." (Doc. No. 198 at 2-3.) Hall cites absolutely no evidence or trial testimony to support her contention that, at trial, the evidence "clearly" disproved any allegation that she had inappropriate interactions with students. Neither does she cite any evidence demonstrating that those particular allegations were motivated by gender discrimination.[18] In fact, Hall filed motions *in limine* that would effectively bar evidence regarding the truth or falsehood (or regarding ASU's investigation into the truth or falsehood) of allegations of misconduct against her. (Docs. No. 159, 160; *see also* Doc. No. 206 at 6-25.) In ruling on those motions, the Court stated that "the sole remaining claim" that "we are here to try today" was "Hall's claim for gender discrimination in suspension from employment." (Doc. No. 206 at 18-19.) The Court stated that it "expect[ed] the parties to stick to the evidence relevant to that claim." (*Id.*) Then, the Court proceeded to rule accordingly when either party attempted to introduce evidence

---

[18] At trial, the issue was whether ASU's suspension of Hall without pay was motivated by gender discrimination, not whether she was discriminatorily or otherwise falsely accused of inappropriate interactions with students.

that went beyond the scope of the issue to be tried. The issue at trial was whether, upon receipt of allegations of Hall's misconduct and prior to its investigation of them, ASU's actions in suspending Hall, including banning her from campus, were motivated by gender discrimination. Whether there was ultimately any truth to those allegations was not relevant to Hall's claim for discriminatory suspension[19] from employment and was not tried to the jury.

It is likely, then, that Hall cites no evidence disproving the allegation that she had "inappropriate interactions with students" because the parties did not try the veracity of that allegation. In any event, because Hall has utterly failed to cite any evidence that "clearly shows" that such an allegation is false, her argument is totally unsupported and her motion is due to be denied on this issue. Fed. R. Civ. P. 7(b) (requiring that a moving

---

[19] Hall contends that ASU's statements to third parties regarding "inappropriate interactions with students" related to ASU's statements regarding its reasons for her termination. (Doc. No. 204 at 1-2 (discussing denial of unemployment benefits and stating that "Plaintiff is simply requesting injunctive relief to prevent ASU's improper and discriminatory conduct of telling entities and others that she *was terminated* for 'inappropriate interactions with students' or insinuating that there were some types of criminal student welfare issues that *caused her termination*" (emphasis added)). Hall also does allege that "[t]hese insinuations are still in Plaintiff's personnel file at ASU in, at least, the notice of banishment/suspension of March 4, 2014." (*Id.*) Hall requests, in her reply brief, that the court enjoin ASU from placing documents in her file stating that she "*was terminated* for student welfare issues that were of a criminal or abusive nature and/or for 'inappropriate interactions with students" and further "request[s] that her public personnel file be produced for examination … to ensure that it contains no documentation containing the untrue statements of 'inappropriate interactions with students.'" (*Id.* at 4 (emphasis added).) In response to Hall's Motion to Amend the Judgment, ASU discusses at length a press release regarding other issues involved in an NCAA investigation that Hall did not mention in her Motion to Amend the Judgment, that ASU does not contend was even introduced at trial, and that appears to have nothing to do with the issues presented at trial or in the pending motions. (Doc. No. 203.) The fact that the parties still continue to attempt to blur the issues by injecting controversies into this case that fall outside Hall's discriminatory suspension claim illustrates why the Court was so careful at trial to limit the issues and to preclude trials within trials on irrelevant disputes.

party must "state with particularity the grounds for" its motion); *Zannino*, 895 F.2d at 17 ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace." (citation and internal quotation marks omitted)). (Doc. No. 12 (Uniform Scheduling Order stating that, "[i]n all briefs filed by any party relating to [a dispositive] motion, the discussion of the evidence in the brief must be accompanied by a specific reference, by page and line, to where the evidence can be found in a supporting deposition or document.[20] Failure to make such specific reference will result in the evidence not being considered by the court.").

To the extent that Hall, who is no longer employed by ASU, may be seeking other unspecified injunctive relief "to prohibit the discriminatory conduct directed towards [Hall] by ASU" in the future or to "enjoin[] [ASU] and all persons acting in concert with [ASU] from engaging in discriminatory and retaliatory employment practice" (Doc. No. 198 at 2), Hall is seeking the sort of nonspecific command to "obey the law" that fails to rise to the level of enforceable relief capable of serving as an available remedy to redress her alleged injuries. Fed. R. Civ. P. 65(d)(1) ("Every order granting an injunction and every restraining order must … state its terms specifically … and … describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required");

---

[20] Neither party ordered a copy of the trial transcript or cited to the trial transcript in their postjudgment motions. Failure to cite the transcript is one thing, regarding which the Court has given equal grace to both parties. However, because the Court is not a mindreader, *Zannino*, 895 F.2d at 17, the Court cannot overlook a party's failure to describe or specify the evidence or testimony on which that party relies.

*Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999) (noting that, "where the terms of the injunction are as general as Title VII itself, the injunction does no more than instruct a defendant to 'obey the law'" and that "[a] court is incapable of enforcing so broad and vague an injunction" as an order prohibiting the defendant city from engaging in racial discrimination in future annexation decisions); *Payne v. Travenol Lab'ys, Inc.*, 565 F.2d 895, 897-98 (5th Cir. 1978)[21] (holding that an injunction prohibiting the defendants from "discriminating on the basis of race, color, or sex in employment practices or conditions of employment" was "too general" to meet the specificity requirement of Rule 65(d) and was the type of "'obey the law' injunction[] [that] cannot be sustained").

Accordingly, Hall's Motion to Amend the Judgment is due to be denied to the extent Hall seeks injunctive relief.

B.    ASU's Renewed Motion for Judgment Notwithstanding the Verdict (Doc. No. 199) and Alternative Motion for a New Trial (Doc. No. 199)

In ASU's Motion for Judgment Notwithstanding the Verdict, or, in the Alternative, Motion for a New Trial (Doc. No. 199), ASU argues (1) Hall failed to establish that she suffered an adverse employment action; (2) the verdict was flawed as a matter of law and against the great weight of the evidence because Hall did not present any evidence of intentional discrimination; (3) Melendez was not a proper comparator because he was not supervised by the same decision maker (Dr. Boyd) who suspended Hall's employment and

---

[21] *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (adopting as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

banned her from campus pending the outcome of the investigation, and because Dr. Boyd allegedly did not have actual knowledge of the allegations against Melendez when she suspended Hall and banned her from campus; (4) ASU had a legitimate, nondiscriminatory reason for suspending Hall's employment; (5) the court erred by including a cat's paw instruction to the jury; (6) the amount of damages awarded Hall exceeded the damages allowable under § 1981a(3); and (7) the amount of damages awarded was excessive as a matter of law and against the great weight of the evidence.

### 1.    Adverse Employment Action

ASU argues that a "'simple paid suspension is not an adverse employment action.'" (Doc. No. 199 at 6 (citing *Davis v. Legal Servs. of Ala., Inc.*, 19 F.4th 1261, 1267 (2021)). On several previous occasions, the Court has already addressed this argument in detail and rejected it. (*See*, *e.g.*, Doc. No. 138 at 9-11.)[22] In raising the argument again, ASU utterly fails to address the reasons underlying the Court's earlier determination that Hall's suspension was not a "simple paid suspension" without more. With no discussion of the facts as developed at trial, ASU merely states that "Hall was placed on suspension. [Hall's] salary remained the same. Therefore, a *prima facie* case cannot be established." (Doc. No. 199 at 8. *But see* Fed. R. Civ. P. 50(a)(2) (providing that a motion for judgment as a matter of law "must specify the judgment sought and the law and facts that entitle the movant to the judgment").

---

[22] The Court's June 17, 2022  Memorandum Opinion and Order can be accessed at *Hall v. Alabama State Univ.*, No. 2:16-CV-593-JTA, 2022 WL 2195021, at *5 (M.D. Ala. June 17, 2022).

As the Court previously stated when ASU earlier sought reconsideration of the Court's ruling on this point:

> This Court's ruling is not in conflict with *Davis*. After surveying the range of decisions within this Circuit, the Court looked at "all of the actions ASU took in suspending Hall – including suspending her from coaching for over a month; barring her from contact with all students ... prevent[ing] her from teaching classes and stopp[ing] her from taking her own classes; and preventing her from having access to her files" and concluded that "this is not a case, like those in other circuits, in which there was a suspension with pay 'without more.' " (Doc. No. 59 at 11-12 (quoting *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006)). ASU does not address these "without more" circumstances. (*See* Docs. No. 134, 136.) Because the Court fully discussed how Hall's suspension was not a simple paid suspension in its summary judgment ruling and ASU does not challenge the Court's "without more" analysis, the Court finds no manifest error in law.

(Doc. No. 138 at 10-11 (footnote omitted).)

As ASU's argument is bare-bones, brings little to the table for consideration, fails to address the reasons for the Court's earlier ruling, presents nothing new, and fails to correctly characterize the evidence at trial, the Court will again simply rest on its earlier conclusion that Hall's suspension was an adverse employment action.

2.      Evidence of Discrimination

In arguing that Hall did not present any evidence of intentional discrimination, ASU couches its argument entirely within the *McDonnell Douglas* burden-shifting framework. (Doc. No. 199 at 2-6.) In ASU's own words, the *McDonnell Douglas* burden-shifting framework is a tool for use in determining whether a plaintiff can "defeat a Motion for Summary Judgment." (*Id.* at 2.) It is not for apportioning burdens of production or proof in considering a posttrial motion. *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1150-51 (11th Cir. 2005) (holding that, once trial proceeds to the point where the defendant

has offered legitimate reasons for its employment discrimination, "there is no good reason" to argue about the *prima facie* case, as the presumption of discrimination raised by the *prima facie* case is no longer relevant); *Tucker v. Hous. Auth. of Birmingham Dist.*, 507 F. Supp. 2d 1240, 1250 (N.D. Ala. 2006), *aff'd*, 229 F. App'x 820 (11th Cir. 2007) ("[T]he proper inquiry at this stage of the litigation focuses on whether sufficient evidence supports a jury finding that Plaintiff met the essential elements of his [Title VII] claims—not, as erroneously argued by Defendant's [postjudgment] motion, the elements of each claim's *prima facie* case.").

Here, the litigation has progressed to the point at which it would be improper to revisit the *prima facie* analysis. Despite ASU's failure to use the appropriate legal framework, the Court will address the heart of ASU's argument, which is ASU's contention that Hall so utterly failed to present evidence of discrimination that Hall failed to make a case at all, or that the jury's verdict is against the great weight of the evidence. In considering this core issue, the Court will evaluate whether Hall presented sufficient evidence that her suspension was motivated by gender discrimination, and whether the jury's finding of discrimination was against the great weight of the evidence. *See id*. at 1251 (holding that, once the issue of a *prima facie* showing drops from the case, "the case is placed back into the traditional framework—in other words, the plaintiff still bears the burden of proving, more probably than not, that the employer took an adverse employment action against him on the basis of a protected personal characteristic." (quoting *Wright v. Southland Corp.*, 187 F.3d 1287, 1291 (11th Cir. 1999))).

As the Supreme Court has stated:

> To "discriminate against" a person … would seem to mean treating that individual worse than others who are similarly situated. *See Burlington N. & S. F. R. Co. v. White*, 548 U.S. 53, 59, (2006). In so-called "disparate treatment" cases like today's, this Court has also held that the difference in treatment based on sex must be intentional. *See, e.g., Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988). So, taken together, an employer who intentionally treats a person worse because of sex—such as by firing the person for actions or attributes it would tolerate in an individual of another sex—discriminates against that person in violation of Title VII.

*Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1740, 207 L. Ed. 2d 218 (2020).

From the facts introduced at trial through witnesses and evidentiary exhibits, a reasonable jury could have concluded (1) Hall was told that she was being suspended pending investigation of alleged unsatisfactory conduct pertaining to student welfare; (2) in being suspended, Hall was totally banned from campus and was not allowed to contact students or access her records; (3) Melendez was also accused of conduct that ASU considered unsatisfactory with respect to student welfare; and (4) Melendez was allowed to continue coaching and remain in contact with students pending the investigation into the allegations against him. That is, Hall demonstrated that ASU intentionally treated the male baseball coach differently from herself, the female softball coach, despite the fact that both were accused of unsatisfactory conduct pertaining to student welfare.[23] *See Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989) (holding that, where the plaintiff alleges discriminatory application of discipline, the plaintiff "must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person

---

[23] ASU does not argue that Melendez and Hall were not accused of violating the same rule or that they were treated the same in response to those accusations.

outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct").[24] Because evidence of such disparate treatment is sufficient to create a reasonable inference of discriminatory intent under the *McDonnell Douglas* standard, *id.*, there is no reason to think that it is not enough to create a triable question on that issue even when the litigation has progressed past the point where the *McDonnell Douglas* lens necessitates application of a burden-shifting analysis. The jury could reasonably have concluded from the facts adduced at trial that (1) ASU treated Hall less favorably in the terms and conditions of her employment with regards to her suspension; and (2) that her gender was a motivating factor that prompted ASU to treat her less favorably.[25] Thus, the jury had a legally sufficient basis for its finding of discriminatory intent. Further, the Court has considered all of the evidence and concludes that any such finding was not against the great weight of the evidence.

Nevertheless, ASU argues that it is entitled to judgment as a matter of law, or at least to a new trial, on grounds that Melendez was not a proper comparator because (1) he

---

[24] Though Hall denies the allegations that she endangered student welfare, this is a case involving suspension pending ASU's investigation of the validity of those allegations; thus, her case turned not on the ultimate validity of the allegations against her, but on whether she was treated differently upon being accused of violating the same rule as Melendez.

[25] As the Court told the jury in an instruction with which ASU takes no issue, this was what Hall had to prove by a preponderance of the evidence to succeed on her claim:

> First: Alabama State University treated her less favorably in the terms and conditions of her employment with regards to her suspension; and

> Second: Ms. Hall's gender was a motivating factor that prompted Alabama State University to treat her less favorably.

(Doc. No. 209 at 48.)

was not supervised by the same decision maker (Dr. Boyd) who suspended Hall's employment and banned her from campus pending the outcome of the investigation; and (2) because Dr. Boyd allegedly did not have actual knowledge of the allegations against Melendez when she approved Hall's suspension. Further, ASU argues that it is entitled to relief from the judgment because it presented evidence of a legitimate, nondiscriminatory reason for suspending Hall's employment.

3.      Melendez as Comparator

On several occasions, the Court has addressed ASU's "different supervisor"/"different decision maker" argument. ASU does not bring up any new arguments or point to any new or different trial evidence on this issue. It merely reiterates a truncated version of its previous argument. Therefore, the Court stands by its previous analysis on this issue and finds that the fact that Dr. Boyd was the president who approved Hall's suspension, but not the one who approved Melendez's suspension, is not determinative in this case. (*See*, *e.g.*, Doc. No. 138 at 6-8.) As the Court previously concluded after considering ASU's earlier motion for reconsideration on this point:

> The Court rejects ASU's argument that *Lewis* and *Hester* stand for the proposition that as a matter of law comparators must be supervised by the same individual or the same decision maker must administer the disciplinary action in order to establish disparate treatment under Title VII. ASU overlooks the qualifiers used by the Eleventh Circuit in *Lewis* and *Hester*. In *Lewis*, the Circuit cautioned that the factors to be compared would indicate valid comparators "in the main" and that potential comparators would "not invariably" have the same supervisor. *Lewis, 918 F.3d at 1227.* In *Hester*, the Circuit noted that its comparator criteria are applied "generally." *Hester*, 798 F. App'x at 457. Hence, the qualifying language employed by the Eleventh Circuit and directions that comparators be evaluated on a case-by-case basis contradict ASU's argument.

(Doc. No. 138 at 7.)

Likewise, on several occasions, the Court has addressed ASU's argument that Melendez is an improper comparator because Dr. Boyd allegedly had no knowledge of how his case was handled at the time she approved Hall's suspension. ASU does not bring up any new arguments or point to any new or different trial evidence on this issue. Therefore, the Court stands by its previous analysis on this issue and finds that Dr. Boyd's alleged lack of knowledge about Melendez's situation does not preclude Melendez from being used as a comparator in this case, since the discriminatory intent in this case allegedly came from Hines and Knight (who *did* know about Melendez's nonsuspension and the accusations against him), not Dr. Boyd, who adopted their suspension recommendation. As the Court previously concluded after considering ASU's earlier motion for reconsideration on this point:

> [A]lbeit the identity of the person who fulfilled the role of ASU president and was the ultimate decision maker as to the discipline imposed changed during the relevant period, the ASU officials who made the recommendation for the discipline remained the same. Accordingly, Hall has raised an inference that she and Melendez were subjected to different treatment under the same employment policy by the same group of officials.

(Doc. No. 138 at 9 (summary judgment record citations omitted).)

The record established at trial is consistent with the Court's previous conclusions on this issue. Regardless of Dr. Boyd's knowledge regarding the allegations against Melendez, Kelly testified that Hines knew about his complaint against Melendez,[26] and

---

[26] At trial, Hall introduced evidence that paragraph (d) of Section 6.1.2 of ASU's Human Resources Policies and Procedures Manual (Defendant's Exhibit 13) provides that "[a] recommendation for

Hines knew Melendez was not suspended pending investigation of Melendez's complaint. Decisions by the athletic director had to be approved by Knight. (Doc. No. 207 at 35-36.) Knight knew about both Hall's and Melendez's situations and, according to Hines, it was Knight who "ultimately decided" to suspend Hall on Hines's recommendation. (Doc. No. 208 at 110-11, 140-41, 159.) Despite knowing about the allegations against and investigation of Melendez, (Doc. No. 208 at 125, 152-53, 166, 171), Knight did not require or recommend imposition of ASU's alleged suspension policy in Melendez's case. At the time he recommended Hall be suspended, Hines[27] also knew of Melendez's nonsuspension (*Id*. at 124, 173-74). Therefore, the previous rulings stand, and Melendez is a proper comparator, despite Dr. Boyd's alleged lack of knowledge about Melendez's situation, and despite the fact that she was not ASU's president when Kelly first made his accusations against Melendez and when Knight did not recommend suspension of Melendez.

Thus, the jury had a legally sufficient basis for relying on Melendez as a comparator, and in light of all the evidence its doing so was not against the great weight of the evidence.

4. ASU's Proffered Legitimate, Nondiscriminatory Reason for Suspending Hall's Employment Pending Investigation

ASU argues that it proffered a legitimate, nondiscriminatory reason for suspending Hall: the parent complaints about Hall in combination with ASU's alleged policy of

---

suspension may be initiated in writing by any supervisor in the employee's chain of command." (Doc. No. 308 at 30-31; Doc. No. 190-18 at 54.)

[27] As Hall suggests, from the testimony and evidence, including inconsistencies within and among testimony from several witnesses, sufficient evidence would have reasonably supported the conclusion that Hines told Hall she was being suspended and banished her from campus before Dr. Boyd had completed her approval of the suspension recommendation.

suspending any employee accused of endangering student welfare. (Doc. No. 199 at 16.) ASU's proffer of a legitimate, nondiscriminatory reason does not entitle it to judgment as a matter of law for several reasons.

First, unlike under the *McDonnell Douglas* analysis,[28] the mere fact that ASU articulated a legitimate, nondiscriminatory reason for the suspension does not, as a matter of law, rebut any inference of discrimination. It was within the jury's province to decide whether ASU's proffered reason was credible and/or whether ASU applied its rule differently in Hall's case than in Melendez's. When, as here, the parties put forth evidence on both sides of a jury question, "with the result hanging in the balance," the jury's verdict "must be left intact if there is evidence from which the [jury] reasonably could have resolved the matter the way it did." *Rodriguez v. Farm Stores Grocery, Inc*., 518 F.3d 1259, 1264 (11th Cir. 2008) (considering a Rule 50 motion for judgment as a matter of law or, in the alternative, motion for new trial); *Lathem v. Dep't of Child. & Youth Servs*., 172 F.3d 786, 793 (11th Cir. 1999) ("Intentional discrimination is an issue of fact."). The critical inquiry "is not whether the evidence was sufficient for [ASU] to have won, but whether the evidence was sufficient for it to have lost. It was." *Rodriguez*, 518 F.3d at 1264-65. As explained previously, the jury saw and heard sufficient evidence from which it reasonably could have found that ASU's explanation was not credible, and also from which the jury could have concluded that discrimination was a motivating factor in Hall's suspension.

---

[28] As explained in Section V.B.2. of this Memorandum Opinion and Order, at this stage of the litigation, it is no longer appropriate to use the *McDonnell Douglas* framework to assign shifting burdens of proof and production.

Melendez's case itself provided evidence from which the jury could have concluded that if ASU did have a blanket policy of suspension when an employee was accused of violating student welfare, ASU nevertheless applied that policy differently to Hall than to Melendez. Knight did not apply the policy to both Hall and Melendez.[29] Hines, who knew about the circumstances of Melendez's case, nevertheless recommended suspension in Hall's case. Dr. Boyd's testimony shifted and grew inconsistent when Hall's attorney pressed her on the reasons why she approved the suspension recommendation from Hines and Knight, but she did state that ASU had a policy to suspend employees pending investigation in the face of complaints concerning student welfare issues. (Doc. No. 208 at 51-52.) In addition, the jury saw the demeanor of Knight, Hines, and Dr. Boyd and were able to take that demeanor into consideration in determining the weight to give their testimony.

As ASU itself acknowledges in its brief, in a case alleging discriminatory application of disciplinary rules, the plaintiff need not necessarily prove that her conduct did not violate or implicate a particular disciplinary rule, but may instead establish an inference of discrimination by showing that she was subjected to more severe consequences for the same rule infraction as someone outside her protected class. (Doc. No. 199 at 6 (quoting *Jones*, 874 F.2d 1534).) "'The relevant inquiry is … whether the employer subjected [the similarly situated employees] to different employment policies.'"

---

[29] As previously noted, at trial, Hall introduced evidence that paragraph (d) of Section 6.1.2 of ASU's Human Resources Policies and Procedures Manual (Defendant's Exhibit 13) provides that "[a] recommendation for suspension may be initiated in writing by any supervisor in the employee's chain of command." (Doc. No. 308 at 30-31; Doc. No. 190-18 at 54.)

(*Id.* (quoting *Lathem*, 172 F.3d at 793).) When the plaintiff establishes that she was treated differently for allegedly violating the same work rule, this "'raises an inference that the rule was discriminatorily applied.'" (*Id.* (quoting *Lathem*, 172 F.3d at 793).)

Thus, as indicated by the authorities ASU cites in its own brief, even if the jury concluded that ASU had a policy that it applied in situations where employees were alleged to have endangered student welfare, and even if the jury believed ASU's testimony that it applied that policy to Hall, a critical issue still would have remained for the jury to decide: whether ASU applied that policy *differently to Hall than to Melendez*.[30] Evidence *was* presented that the policy was applied differently to Hall and Melendez. Therefore, according to the cases ASU itself cited, that evidence alone would be sufficient to raise an inference that the policy was discriminatorily applied. Hence, the jury had a legally sufficient basis for inferring that, if there was such a rule, and if ASU used its policy as the basis for suspending Hall and banning her from campus and communicating with students, then ASU discriminatorily applied the policy to her. Further, in light of all of the testimony and evidence presented at trial, the jury's finding in that regard was not against the great weight of the evidence.

5.    Cat's Paw Instruction

At trial, the Court gave the following jury instruction:

Ms. Hall claims that Alabama State University's decision to suspend Ms. Hall was based on the recommendation of Ms. Hall's supervisor and that Ms.

---

[30] While ASU emphasizes that it provided a legitimate nondiscriminatory reason for suspending Hall, ASU provided no legitimate, nondiscriminatory reason why it chose *not* to suspend Melendez in the face of the rule, despite its witnesses' admissions that the accusations against Melendez concerned student welfare.

Hall's gender was a motivating factor in the supervisor's recommendation. If Ms. Hall's supervisor recommended that Alabama State University suspend Ms. Hall and Ms. Hall's gender motivated the supervisor's recommendation, the supervisor's recommendation can be a "motivating factor" behind Ms. Hall's employment decision — even if the supervisor did not make the ultimate decision to suspend Ms. Hall.

But Ms. Hall's gender can be a motivating factor in Alabama State University's decision only if you find that Ms. Hall has proved each of the following by a preponderance of the evidence: A, the supervisor acted with the intent to make Alabama State University suspend Ms. Hall, which means that the supervisor wanted Alabama State University to suspend Ms. Hall or the supervisor believed that his actions would cause Alabama State University to suspend Ms. Hall; B, Ms. Hall's gender was a motivating factor behind the supervisor's actions; and C, there was a direct relationship between the supervisor's actions and Ms. Hall's suspension.

(Doc. No. 209 at 50; Doc. No. 187 at 9.)

The above instruction is adapted from the cat's paw instruction in the Eleventh Circuit Pattern Jury Instruction 4.5. ASU does not argue it was an incorrect statement of the law.[31] Rather, ASU argues that the instruction should not have been given to the jury because (1) Hall did not plead a cat's paw theory in her Complaint; (2) the court did not deny ASU's summary judgment motion based on a cat's paw theory; (3) the evidence did not establish Hall's supervisor acted with discriminatory intent in recommending Hall's suspension;[32] and (4) the evidence established that Dr. Boyd served as the ultimate

---

[31] "A district court 'enjoys broad discretion to formulate jury instructions provided those instructions are correct statements of the law.'" *Buland v. NCL (Bahamas) Ltd*, 992 F.3d 1143, 1152 (11th Cir. 2021) (quoting *United States v. Lebowitz*, 676 F.3d 1000, 1014 (11th Cir. 2012)).

[32] As discussed previously in Sections V.B.2.-4. of this Memorandum Opinion and Order, sufficient evidence warranted the jury's finding that Hines's and Knight's suspension recommendation was discriminatory towards Hall, and such a finding was not against the great weight of the evidence. The Court will not go through that analysis in detail again in this Section of the Memorandum Opinion and Order.

decisionmaker and reviewed parents' complaints about Hall instead of "just rubber stamp[ing] the recommendation of Hines." (Doc. No. 199 at 18-21.)

ASU offers no legal authority for its contention that Hall was required to plead a cat's paw theory in her Complaint before she was entitled to a jury instruction on the issue. "A party's failure to cite legal authority in support of its position 'suggests either that there is no authority to sustain its position or that it expects the court to do its research.'" *Goldberg for Jay Peak, Inc. v. Raymond James Fin., Inc*., CASE NO. 16-21831-cv-LENARD/GOODMAN, 2017 WL 7791564, at *7 (S.D. Fla. Mar. 27, 2017) (quoting *Rapid Transit Lines, Inc. v. Wichita Developers, Inc.*, 435 F.2d 850, 852 (10th Cir. 1970)). "The Court declines the invitation and rejects the argument for failure to cite supporting authority." *Id*.

Likewise, ASU offers no legal authority that the Court was required to address the cat's paw issue on summary judgment in order for Hall to be entitled to a cat's paw jury instruction at trial. Again, the Court declines the invitation to do ASU's research for it and rejects ASU's argument on that basis. However, the Court will point out that ASU's argument is unfaithful to the summary judgment record. A cat's paw instruction is used when the plaintiff contends that (1) her protected trait was a motivating factor in her supervisor's recommendation that the employer take an adverse employment action and (2) the plaintiff's employer based its decision on the plaintiff's supervisor's recommendation. Pattern Civ. Jury Instr. 11th Cir. 4.5 (2022) (Annotation E., "Cat's Paw"). The summary judgment record makes clear that Hall intended to make those exact arguments in this case. Specifically, in denying summary judgment, the Court addressed

Hall's arguments (1) "that regardless of which ASU president presided over the investigations, the same ASU officials were responsible for the recommendations to suspend Hall and not suspend Melendez," and (2) "because the same ASU officials determined the response to both complaints [against Hall and Melendez] and recommended that Dr. Boyd suspend Hall, it is appropriate to find comparator status," even though Dr. Boyd was not the ultimate decisionmaker in Melendez's case. (Doc. No. 138 at 8-9.)

In other words, it was transparently obvious at the summary judgment stage that Hall sought to hold ASU responsible on grounds that her supervisors, who treated her differently than Melendez, recommended her suspension with discriminatory animus, and that the supervisors' discriminatory recommendation formed the basis of ASU's decision, through Dr. Boyd, to suspend Hall. The Court is unimpressed with ASU's feigned surprise that Hall pursued such a theory at trial and that the Court presented the cat's paw instruction to the jury.

ASU argues, in essence, that there was no direct relationship between Hall's supervisors' recommendations (and their discriminatory intent) and Hall's suspension because Dr. Boyd testified she made the decision to suspend Hall after independently reviewing complaints about Hall and did not simply rubber stamp Knight's (or Hines's) suspension decision or recommendation. (Doc. No. 199 at 20.) However, given Dr. Boyd's shifting recollection about receiving additional information prior to approving Hines's recommendation, and also in light of inconsistencies between that testimony and the timeline established by other evidence, reasonable jurors could have concluded that Dr. Boyd's testimony on this point was not credible. (Doc. No. 208 at 63-97.) Additionally,

Hines testified that he recommended Hall's suspension to Knight, and Knight was the one who "ultimately decided" to suspend Hall. (Doc. No. 208 at 110-11, 140, 159.) Accordingly, even when weighed against the evidence that supports ASU's theory of the case, Hall presented sufficient evidence from which a jury could reasonably have concluded that Dr. Boyd's decision was based on Hines's and Knight's recommendation.

Therefore, the evidence presented at trial warranted the cat's paw instruction. *See* Pattern Civ. Jury Instr. 11th Cir. 4.5 (2022) (Annotation E., "Cat's Paw") (citing *Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011) and stating: "[t]he optional cat's paw charge is to be used only in cases where the plaintiff claims that (1) the employer's decision was based on the recommendation of the plaintiff's supervisor and (2) the plaintiff's protected trait was a motivating factor in the supervisor's recommendation[33]"); *see also KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 194 F. App'x. 591, 601 (11th Cir. 2006) (noting that a trial court's discretionary decision to give jury instruction is assessed by examining the jury instructions as a whole to determine whether they fairly and adequately addressed the issue and correctly stated the law within the context of the complaint, the evidence presented, and the arguments of counsel).

Because, as a matter of law, the cat's paw instruction was appropriately given, ASU is not entitled to postjudgment relief on this issue.

---

[33] As discussed in Section V.B.2. of this Memorandum Opinion and Order, Hall did present evidence from which a reasonable jury could conclude that her supervisor, Hines (and also her supervisor's supervisor, Knight) acted with discriminatory intent when they recommended her suspension. The Court will not go through that evidence yet again. It is enough to note that the evidence at trial warranted the cat's paw instruction.

6.      Excessiveness of Damages - § 1981(a)

ASU argues that the jury's $800,000.00 damages award is excessive in light of § 1981a(3), which limits damages to $300,000.00 for employers with over 500 employees.[34] Hall concedes that the $300,000.00 damages cap applies. Pursuant to § 1981a(3), ASU is entitled to relief. However, what ASU really seeks is amendment of the judgment reducing the damages awarded to $300,000.00 to correct a clear error of law or prevent manifest injustice that could not have been brought to the court's attention prior to the announcement of the jury's verdict. *See Baldwin v. City of Prichard, Alabama*, No. CA 07-0789-C, 2009 WL 1211385, at *2 (S.D. Ala. May 4, 2009) (addressing a similar Rule 59(e) motion). Therefore, despite ASU's decision to couch its motion as one for judgment as a matter of law, the motion is CONSTRUED as a Rule 59(e) motion to alter or amend the judgment to limit the damages to the maximum allowed under § 1981a(3), that motion will be granted, and an amended judgment will be entered.

7.      Excessiveness of Damages – Weight of the Evidence

In its initial brief, ASU argued only that the *$800,000.00 verdict* was excessive in light of the lack of medical evidence presented at trial and the fact that Hall's emotional distress stemmed from a two-month suspension. (Doc. No. 199 at 17.) Because ASU is entitled to a reduction of the jury award to $300,000.00 pursuant to § 1981a(3), the Court

---

[34] ASU presents no evidence of the number of employees that it employed during the relevant time period. However, the lack of evidence on this point does not prejudice Hall because ASU contends it is entitled to be treated as the largest employers are for purposes of § 1981a, thus making it susceptible to the largest amount of damages available under that section.

need not consider ASU's argument that $800,000.00 in compensatory damages was against the great weight of the evidence.

Not until it filed its reply brief did ASU also specially argue that an award of *$300,000.00* would be excessive in light of the evidence presented at trial. Therefore, Hall was not on notice that she needed to respond to that argument in her brief. Accordingly, ASU waived its argument that it is entitled to judgment as a matter of law or new trial on grounds that $300,000.00 is excessive in light of the evidence presented at trial. *Lombard v. Baker*, No. 2:22-CV-328-ECM-JTA, 2023 WL 2974933, at *2 (M.D. Ala. Feb. 22, 2023), *report and recommendation adopted*, No. 2:22-CV-328-ECM, 2023 WL 2525509 (M.D. Ala. Mar. 15, 2023) (collecting cases cited in support of the court's decision not to consider arguments that were raised for the first time in a reply brief and that were neither presented in the original dispositive motion nor responsive to the opposing party's brief because, "[a]s Defendants' counsel surely well knows, a reply brief is not the appropriate place for raising new arguments"); *Fisher v. Ciba Specialty Chems. Corp.*, No. CIV.A. 03-0566-WS-B, 2007 WL 2302470, at *4 (S.D. Ala. Aug. 8, 2007) (stating that "it is generally improper to raise new arguments for the first time in a reply brief" because "[i]t would be unfair and improper to consider these newly raised arguments at this time, when defendants could have raised them earlier and plaintiffs have not had an opportunity to be heard on them"); *see United States v. Coy*, 19 F.3d 629, 632 n.7 (11th Cir. 1994) ("Arguments raised for the first time in a reply brief are not properly before a reviewing court."); *Lariscy v. Coleman Co., Inc.*, No. 4:08-CV-0123-HLM, 2010 WL 11598166, at *1 n.1 (N.D. Ga. May 13, 2010) ("To the extent that Plaintiff complains in her reply brief that the jury's verdict

'is strongly against the weight of the evidence,' Plaintiff waived that argument by asserting it for the first time in her reply."); *see also Balthazar Mgmt., LLC v. Beale St. Blues Co., Inc.*, No. 17-CV-81214, 2019 WL 1958548, at *5 (S.D. Fla. Apr. 9, 2019) ("It is improper to raise an argument for the first time in a reply and the Court does not consider such argument."); *United States v. Asher*, No. 1:09-CR-414-WSD, 2012 WL 13106304, at *35 (N.D. Ga. Oct. 17, 2012) (declining to consider arguments raised for the first time in a reply brief), *aff'd*, 564 F. App'x 963 (11th Cir. 2014); *Belfast v. Upsilon Chapter of Pi Kappa Alpha Fraternity at Auburn Univ.*, 267 F. Supp. 2d 1139, 1147 (M.D. Ala. 2003) ("[T]he Court will not address arguments made for the first time in a reply brief.").

Alternatively, even if the Court were to consider ASU's argument regarding the alleged excessiveness of an award of $300,000.00, ASU still would not prevail. "Unlike special damages … general compensatory damages 'need not be proven with a high degree of specificity' and 'may be inferred from the circumstances as well as proved by the testimony.'" *Tucker*, 229 F. App'x at 826–27 (quoting *Akouri v. Florida Dep't of Transportation*, 408 F.3d 1338, 1345 (11th Cir. 2005)). Though such damages may not be established by conclusory statements that the plaintiff suffered emotional distress or presumed from the fact that discrimination occurred, a plaintiff's testimony alone can support an award of compensatory damages for emotional distress if that testimony is sufficiently articulated and establishes that the plaintiff suffered demonstrable emotional distress. *Id*; *Akouri*, 408 F.3d at 1345. Here, Hall did sufficiently articulate that she suffered demonstrable emotional distress.

The jury saw Hall's anguished demeanor on the stand, which the jury could reasonably have found demonstrated ongoing emotional distress from the suspension and the manner of the suspension, despite the fact that the suspension itself lasted only two months. *See Tucker v. Hous. Auth. of Birmingham Dist.*, 229 F. App'x 820, 826 (11th Cir. 2007) ("We are 'particularly deferential to the fact finder's determination of compensatory damage awards for intangible, emotional harms because the harm is so subjective and evaluating it depends considerably on the demeanor of the witnesses." (quoting *Griffin v. City of Opa–Locka*, 261 F.3d 1295, 1315 (11th Cir. 2001) (internal quotation omitted)). The jury heard Hall's specific testimony about the emotional and mental distress she suffered because of the manner in which ASU suspended her employment. The jury also heard Hall articulate the specific effects that same mental and emotional distress had on her as a mother to her child and on her career, her education, her ability to communicate with friends and family, her personal life, and her interests. The distress from how ASU suspended her made her not want to teach or coach anymore–something about which she previously was passionate–and it cost Hall her lifetime love of the game of softball and her ability to enjoy the game with her family, not to mention her passion for her *alma mater*.

In light of this and all other evidence presented at trial, it cannot be said that a $300,000.00 award of compensatory damages is against the great weight of the evidence or that ASU is entitled to judgment as a matter of law on this issue. Accordingly, ASU's postjudgment motions are due to be denied on this issue.

## VI.    CONCLUSION

Accordingly, it is ORDERED as follows:

1.    Hall's Motion to Amend the Final Judgment (Doc. No. 198) is DENIED.

2.    ASU's Motion for Judgment Notwithstanding the Verdict (Doc. No. 199) is CONSTRUED as containing a Rule 59(e) motion to alter or amend the judgment to reduce the compensatory damages to $300,000.00 in accordance with 42 U.S.C. § 1981a(3), and the Rule 59(e) motion to reduce the compensatory damages to $300,000.00 is GRANTED. An amended judgment will issue accordingly.

3.    In all other respects, ASU's Motion for Judgment Notwithstanding the Verdict (Doc. No. 199) is DENIED.

4.    ASU's Alternative Motion for a New Trial (Doc. No. 199) is DENIED.

DONE this 26th day of September, 2023.

JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE